**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): _____     Caption [use short title]

Motion for: Petition for Permission to Appeal Pursuant

to 28 U.S.C. § 1292(b) and Fed. App. Proc. 5                     SIRIUS XM RADIO INC.,

_____                                                            Petitioner,

_____                     V.

Set forth below precise, complete statement of relief sought:          FLO & EDDIE, INC.,

Petitioner requests permission to take an interlocutory                                       Respondent.

appeal of the district court's November 14, 2014 and

December 12, 2014 orders.  If permission is granted, petitioner

will argue that this Court should reverse the district court's

rulings on the two questions set forth in the petition.

_____

MOVING PARTY: Sirius XM Radio Inc.          OPPOSING PARTY: Flo & Eddie, Inc.

☐ Plaintiff          ☑ Defendant

☑ Appellant/Petitioner          ☐ Appellee/Respondent

MOVING ATTORNEY: Daniel M. Petrocelli          OPPOSING ATTORNEY: Henry Gradstein

[name of attorney, with firm, address, phone number and e-mail]

Daniel M. Petrocelli, O'Melveny & Myers LLP          Henry Gradstein, Gradstein & Marzano, PC

1999 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067-6035          6310 San Vicente Blvd., Ste. 510, Los Angeles, CA 90048

(310) 553-6700   dpetrocelli@omm.com          (323) 776-3100   hgradstein@gradstein.com

Court-Judge/Agency appealed from: United States District Court for the Southern District of New York, Hon. Colleen McMahon, District Judge

**Please check appropriate boxes:**          **FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has movant notified opposing counsel (required by Local Rule 27.1):          Has request for relief been made below?          ☐ Yes ☐ No
☑ Yes ☐ No (explain): _____          Has this relief been previously sought in this Court?          ☐ Yes ☐ No
                                                                                         Requested return date and explanation of emergency: _____

Opposing counsel's position on motion:
☐ Unopposed ☐ Opposed ☑ Don't Know

Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

Is oral argument on motion requested?  ☑ Yes ☐ No  (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No  If yes, enter date: _____

**Signature of Moving Attorney:**
/s/ Daniel M. Petrocelli_____ Date: 2/20/2015 _____          Service by: ☐ CM/ECF          ☑ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

# 15-_____

## In The

## United States Court of Appeals

### For the Second Circuit

SIRIUS XM RADIO INC., A DELAWARE CORPORATION;
AND DOES 1 THROUGH 10

*Defendant-Petitioner*,

v.

FLO & EDDIE, INC., A CALIFORNIA CORPORATION, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY SITUATED

*Plaintiff-Respondent.*

Interlocutory Appeal Sought from the
United States District Court for the Southern District of New York
Hon. Colleen McMahon, District Judge

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO
## 28 U.S.C. § 1292(b) AND FEDERAL RULE OF APPELLATE PROCEDURE 5

Daniel M. Petrocelli
Robert M. Schwartz
Victor H. Jih
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel states as follows:

1.     Sirius XM Radio Inc. is a wholly owned subsidiary of Sirius XM Holdings Inc., a publicly held corporation.

2.     Liberty Media Corporation possesses an ownership interest of 10 percent or more in Sirius XM Holdings Inc.


Dated:        February 20, 2015        O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
   Daniel M. Petrocelli
   Robert M. Schwartz
   Victor H. Jih
   1999 Avenue of the Stars, 7th Floor
   Los Angeles, CA  90067-6035
   Telephone:     (310) 553-6700
   Facsimile:     (310) 246-6779

*Attorneys for Petitioner Sirius XM Radio Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

QUESTIONS PRESENTED...................................................................4

STATEMENT OF RELEVANT FACTS ..............................................4

ARGUMENT ...................................................................................6

I.   WHETHER THE OWNER OF A PRE-1972 SOUND RECORDING
     HAS THE EXCLUSIVE RIGHT TO CONTROL ITS PUBLIC
     PERFORMANCE WARRANTS INTERLOCUTORY APPEAL…... .........6

     A.   This Is A Controlling Question Of Law................................................6

     B.   There Is Substantial Ground for Difference of Opinion. ....................8

          1.   New York Common Law Has Never Recognized a
               Performance Right in Sound Recordings..................................8

          2.   A Performance Right Can Only Be Created Legislatively......12

     C.   Interlocutory Appeal Would Materially Advance the Litigation.......17

II.  INTERLOCUTORY APPEAL IS ALSO WARRANTED TO
     DETERMINE WHETHER NEW YORK COMMON LAW IS
     SUBJECT TO COMMERCE CLAUSE SCRUTINY ................................17

CONCLUSION.................................................................................20

CERTIFICATE OF SERVICE ..........................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003) ................................................................19

*BMW of N. Am. v. Gore*,
  517 U.S. 559 (1996) ...................................................................3, 18

*Campaign for Fiscal Equity, Inc. v. New York*,
  8 N.Y.3d 14 (2006) ........................................................................16

*Capitol Records, Inc. v. Mercury Records Corp.*,
  221 F.2d 657 (2d Cir. 1955) ......................................................10, 11

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  830 N.E.2d 250 (N.Y. 2005) ......................................................10, 11

*Capitol Records, LLC v. Vimeo, LLC*,
  972 F. Supp. 2d 537 (S.D.N.Y. 2013) ................................................8

*Chamberlain v. Feldman*,
  300 N.Y. 135 (1949) ......................................................................16

*City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*,
  877 F.2d 1146 (2d Cir. 1989) .........................................................15

*Fed. Housing Fin. Agency v. UBS Ams., Inc.*,
  858 F. Supp. 2d 306 (S.D.N.Y. 2012) ................................................8

*Figueiredo Ferraz Consultoria E Engenharia de Projecto LTDA. v.
  Republic of Peru*,
  665 F.3d 384 (2d Cir. 2011) ...........................................................17

*Flo & Eddie, Inc. v. Pandora Media, Inc.*,
  Case No. 2:14-cv-07648 (C.D. Cal.) .................................................7

*Healy v. Beer Institute, Inc.*,
  491 U.S. 324 (1989) .......................................................................19

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Ileto v. Glock Inc.*,
349 F.3d 1191 (9th Cir. 2003) ........................................................... 18

*In re Duplan Corp.*,
591 F.2d 139 (2d Cir. 1978) ................................................................ 6

*In re Lloyd's Am. Trust Fund Litig.*,
1997 WL 458739 (S.D.N.Y. Aug. 12, 1997) ....................................... 7

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione*,
921 F.2d 21 (2d Cir. 1990) ...................................................... 6, 8, 17

*Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
199 Misc. 786 (N.Y. Sup. Ct. 1950) ................................................. 11

*NCAA v. Miller*,
10 F.3d 633 (9th Cir. 1993) .............................................................. 19

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
92 N.Y.2d 458 (1998) ....................................................................... 16

*Pike v. Bruce Church Inc.*,
397 U.S. 137 (1970) ........................................................................... 19

*RCA Manufacturing Co. v. Whiteman*,
114 F.2d 86 (2d Cir. 1940) ......................................................*passim*

*Reese v. BP Exploration Inc.*,
643 F.3d 681 (9th Cir. 2011) ............................................................ 17

*Zenbu Magazines LLC v. Escape Media Grp., Inc.*,
Case No. 1:15-cv-00349 (E.D.N.Y.) .................................................. 7

**STATUTES**

17 U.S.C. § 106 .................................................................................... 4

17 U.S.C. § 115 .................................................................................... 4

# TABLE OF AUTHORITIES
## (continued)

Page(s)

28 U.S.C. § 1292 ...................................................................................6

N.C. GEN. STAT. § 66-28 ......................................................................20

S.C. CODE ANN. § 39-3-510 ................................................................20


OTHER AUTHORITIES

47 C.F.R. § 25.144(e)(4) ......................................................................18

23 FCC Rcd 12348 (2008) ...................................................................18

Act of Jan. 6, 1897, ch. 4, 29 Stat. 481 ...............................................13

Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings & State Copyright Law*, TECHNOLOGY & MARKETING BLOG (Oct. 1, 2014), http://blog.ericgoldman. ..............................................................2, 8, 9

*Copyright Law Revision: Hearing Before the Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary*, 90th Cong. 494 (1967) ......................................................................14

Douglas G. Baird, *Common Law Intellectual Property & the Legacy of Int'l News Serv. v. Assoc. Press*, 50 U. CHI. L. REV. 411 (1983) ..............10

H.R. REP. NO. 104-274 (1995) .............................................................15

June M. Besek & Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J.L. & ARTS 327 (2014) ................................................................10

Lauren E. Kilgore, *Guerrilla Radio: Has the Time Come for a Full Performance Right in Sound Recordings?*, 12 VAND. J. ENT. & TECH. L. 549 (2010) ........................................................................................12

*Revision of Copyright Laws: Hearings Before the H. Comm. on Patents, Revised Copy for Use of the Comm. on Patents*, 74th Cong. 622 (1936) ..........13

iv

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 GEO. WASH. L. REV. 152 (1974)................................................10

S. REP. NO. 104-128 (1995)........................................................................15

Sidney A. Diamond, *Sound Recordings and Phonorecords: History & Current Law*, 1979 U. ILL. L. F. 337 (1979) ................................................10, 11

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971) ..............14

Steven Seidenberg, *US Perspectives: Courts Recognize New Performers' Rights*, INTELL. PROP. WATCH (Nov. 24, 2014), http://law.scu.edu ....................9

SUPP. REGISTER'S REP. ON THE GEN. REVISION OF U.S. COPYRIGHT LAW, 89th Cong. (H. Comm. Print 1965) ....................................................................13, 14

Symposium, *The Semiconductor Chip Protection Act of 1984*, 70 MINN. L. REV. 579 (1986) ..............................................................................................9

U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE (2015).......16

U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS (2011)........10

## PRELIMINARY STATEMENT

The district court held, for the first time, that New York common law gives the owner of a pre-1972 sound recording the exclusive right to control its performance.  For almost a century, pre-1972 recordings have been freely and widely performed for the public—including by AM/FM radio stations, restaurants and other businesses, sports arenas, and individuals—without restriction, license, or compensation.  For over a decade, satellite and digital broadcasters such as petitioner Sirius XM have done the same.

Until now, no court has *ever* held that the owner of a pre-1972 recording has a so-called "performance right"—*i.e.*, the right to control, after a record's sale, when it is performed, by whom, and for how much.  To the contrary, this Court held in *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), that there was no such right.  Courts in New York and elsewhere have recognized only limited rights in pre-1972 recordings—*i.e.*, the right to prevent the unauthorized duplication and distribution of bootleg recordings.  This is consistent with the federal Copyright Act, in which Congress declined to recognize any rights in sound recordings other than duplication and distribution, because doing so could, among other things, harm composers by reducing broadcasts of their music and their resulting royalties.  In 1995, Congress passed legislation recognizing a limited performance right for *post*-1972 recordings, which included key exemptions

(including a carve-out for AM/FM radio) and a compulsory licensing scheme to balance the interests of owners against the interests of composers in having their works widely disseminated and the interests of the public and broadcasters in having access to pre-1972 recordings at a reasonable price.

Against this backdrop, the district court's ruling is a stark anomaly. As one scholar explained, recognition of a common law performance right in sound recordings would "undo a 75-year-old consensus" established by *Whiteman*. Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings & State Copyright Law*, TECHNOLOGY & MARKETING BLOG (Oct. 1, 2014), http://blog.ericgoldman. org. Even the district court acknowledged that its "unprecedented" ruling would "upset … settled expectations," have "significant economic consequences" that could "upend the analog and digital industries," and create enormous "administrative difficulties in the imposition and collection of royalties," which would ultimately increase consumer costs, shut down many broadcasters, and decrease access to pre-1972 recordings. Ex. A at 24, 39-40. New York law is clear that where, as here, the creation of a right would dramatically expand the common law and implicate conflicting social policies, that right can be created *only* by a legislature.

The district court recognized that the performance-right issue is a "thorn[y] question … of first impression" as to which there are substantial grounds for difference of opinion. Ex. A at 16, Ex. C at 56. The court certified its orders for

interlocutory appeal and asked this Court to provide "authoritative guidance." Ex. C at 55. That guidance is needed now. An immediate appeal could not only "dispose of the entire case," but help resolve the growing onslaught of "follow-on actions." *Id.* Absent immediate review, the district court's ruling leaves Sirius XM and other broadcasters with tremendous uncertainty, faced with a choice between stopping the broadcast of pre-1972 recordings to the public's detriment; submitting to shotgun negotiations with sound recording owners; or facing massive liability as this case and others wend their way through the courts.

In addition to the performance-right issue, the district court's orders address another controlling, case-dispositive legal question: whether it would violate the Commerce Clause to apply a New York performance right to Sirius XM, which broadcasts across the country through satellite radio, the Internet, and mobile devices and is prohibited by the FCC from tailoring its satellite broadcasts by state. The court concluded that a state's common law is not a "regulation" subject to Commerce Clause scrutiny, and did not find a substantial ground for difference of opinion on this issue. Sirius XM disagrees. It is well settled that *any* exercise of state power can violate the Commerce Clause, including a court's application of state common law. *See BMW of N. Am. v. Gore*, 517 U.S. 559, 572 n.17 (1996).

Sirius XM respectfully petitions this Court for permission to take an interlocutory appeal of the district court's orders addressing these two issues.

3

## QUESTIONS PRESENTED

1.      "Under New York law, do the holders of common law copyrights in pre-1972 sound recordings have, as part of the bundle of rights attendant to their copyright, the right to exclusive public performance?"  Ex. C at 54.

2.      "Does the Dormant Commerce Clause prohibit the State of New York from enforcing a property right that it recognizes at common law?"  *Id.* at 58.

## STATEMENT OF RELEVANT FACTS

Respondent claims to own certain pre-1972 sound recordings of songs by The Turtles.[1]  Since those recordings were created over 40 years ago, respondent never objected to or demanded compensation from the many broadcasters, businesses, or individuals who publicly performed them.  But in 2013, respondent filed a series of lawsuits claiming that it has an absolute right to block and control all public performances.  In the lawsuit below, respondent alleged that Sirius XM violated New York law by performing its recordings and making incidental reproductions (*e.g.*, buffer and cache copies) in aid of those performances.

---

[1] This action concerns sound recordings rather than the underlying musical compositions.  Musical compositions—the notes and lyrics written by a song's composer—are protected by federal copyright law, which provides a performance right in musical compositions subject to a compulsory licensing scheme.  17 U.S.C. §§ 106(4), 115.  Every time Sirius XM broadcasts a song (whether pre- or post-1972), it pays royalties to the owner of the musical composition.  Sound recordings—the medium on which a particular performance of a song is fixed—are a very "different animal."  *See* Ex. A at 10-12.

4

Sirius XM moved for summary judgment on two grounds. First, Sirius XM's broadcasts were lawful and any incidental reproductions were fair use because New York law does not provide any performance right to owners of pre-1972 sound recordings—which is why respondent never before objected to the broadcast of its recordings or sought to enforce a performance right. Second, even if there were a performance right, applying such a right to Sirius XM's nationally uniform broadcasts would violate the Commerce Clause. On November 14, 2014, the district court denied Sirius XM's motion. Ex. A.

As to the first issue, the court concluded that there was "[n]o New York case [that] so much as suggested" there was not a performance right in pre-1972 recordings, and interpreted this "judicial silence" to mean there *was* such a right. *Id.* at 15-25. As to the second issue, the court concluded that New York's common law was not a "regulation" to which the Commerce Clause applied and accordingly declined to undertake a Commerce Clause analysis. *Id.* at 34-39.

Sirius XM moved for reconsideration based in part on the Second Circuit's decision in *Whiteman*, which had not been addressed in the summary judgment briefing, and requested in the alternative that the district court certify its summary judgment order for interlocutory appeal. The court denied Sirius XM's motion for reconsideration on December 12, 2014, Ex. B, and subsequently certified its

November 14, 2014 and December 12, 2014 orders for interlocutory appeal and stayed the proceedings below.  Ex. C.  This petition timely followed.

## ARGUMENT

Interlocutory review is appropriate when an order presents (1) "a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "appeal … may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  All of those requirements are satisfied here.

## I. WHETHER THE OWNER OF A PRE-1972 SOUND RECORDING HAS THE EXCLUSIVE RIGHT TO CONTROL ITS PUBLIC PERFORMANCE WARRANTS INTERLOCUTORY APPEAL.

### A. This Is A Controlling Question Of Law.

The district court rightly held that there is "a critically important controlling question of law in this case: whether the holders of common law copyrights in pre-1972 sound recordings have, as part of the bundle of rights appurtenant to their copyright, the right to exclusive public performance."  Ex. C at 55.  A question of law is "controlling" where its resolution could "importantly affect the conduct of an action" or have an "impact … on other cases."  *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri*, 921 F.2d 21, 24 (2d Cir. 1990).  Here, an interlocutory appeal would serve both goals.

First, reversal of the district court's ruling on this issue would resolve "significant portions of this lawsuit" and could "dispose of the entire case."  Ex. C at 55.  At a minimum, reversal would compel dismissal of respondent's

performance-based claims—the core of its complaint. As the court noted, reversal would also require reconsideration of respondent's reproduction-based claims, since it is "arguable that the making of temporary copies in order to facilitate the public performance of such sound recordings qualifies as 'fair use.'" *Id.*

Second, this Court's ruling on the performance-right issue "will have 'precedential value for a large number of cases.'" *Id.* at 55 (citing *In re Lloyd's Am. Trust Fund Litig.*, 1997 WL 458739, at *4-5 (S.D.N.Y. Aug. 12, 1997)). In particular, there are three related actions pending against Sirius XM in California and Florida based on asserted performance rights.[2] Respondent recently filed a similar lawsuit against Pandora in California.[3] And in the past few weeks, copycat lawsuits were filed against Apple, Sony, and other digital broadcasters, at least one of which asserts performance rights under New York law.[4] The district court predicted that "[o]ther broadcasters … will undoubtedly be sued," Ex. A at 40, and commentators have warned that "traditional AM/FM broadcasters … can expect to

---

[2] In *Flo & Eddie, Inc. v. Sirius XM Radio*, Case No. 2:13-cv-05693 (C.D. Cal.), the court granted Flo & Eddie's motion for summary judgment on the performance-right issue under California statutory law. In *Flo & Eddie, Inc. v. Sirius XM Radio*, Case No. 1:13-cv-23182 (S.D. Fla.), Sirius XM's motion for summary judgment on the performance-right issue under Florida law is pending. In *Capitol Records v. Sirius XM Radio*, Case No. BC 520981 (Los Angeles Super. Ct.), the court granted plaintiffs' motion for a jury instruction on the performance-right issue under California statutory law, but certified its ruling for interlocutory appeal. Sirius XM's writ petition is pending before the California Court of Appeal.

[3] *Flo & Eddie, Inc. v. Pandora Media, Inc.*, Case No. 2:14-cv-07648 (C.D. Cal.).

[4] *See Zenbu Magazines v. Escape Media*, Case No. 1:15-cv-00349 (E.D.N.Y.).

be sued next." Ochoa, *supra*. An interlocutory appeal would "help resolve those actions quickly and consistently." Ex. C. at 55. *See Fed. Housing Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 338 (S.D.N.Y. 2012) (interlocutory review warranted to "facilitate and streamline" other cases).

**B.    There Is Substantial Ground for Difference of Opinion.**

As the district court concluded, "there is substantial ground for difference of opinion concerning the Summary Judgment Decision." Ex. C at 56. Such ground exists where "(1) there is conflicting authority on [an] issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013). The district court acknowledged that the existence of a performance right under New York law is a "thorn[y] question … of first impression" that has not been addressed by any court. Ex. A at 16. This in itself warrants interlocutory appeal. *See Klinghoffer*, 921 F.2d at 25 (certification proper where "issues are difficult and of first impression"). The district court emphasized, however, that "here there is far more than a previously unaddressed question of law. There is in fact a difficult legal question about which reasonable minds can differ." Ex. C at 56.

**1.    New York Common Law Has Never Recognized a Performance Right in Sound Recordings.**

There is *no* other case recognizing a performance right in pre-1972 sound recordings under New York law. *Whiteman* is the only case to squarely address

8

the existence of such a right, and it held that there was none. In that case, a record company and orchestra leader brought common law copyright infringement and unfair competition claims against a radio network for broadcasting their records. In an opinion written by Judge Learned Hand, this Court considered "whether [the performer] and/or [record label] had any musical property at common-law in the records which radio broadcasting invaded"—*i.e.*, whether the owner of a sound recording had any common law performance right. 114 F.2d at 87.

Judge Hand held that common law copyright "consists *only* in the power to prevent others from reproducing the copyrighted work," 114 F.2d at 88 (emphasis added)—*i.e.*, *there is no common law performance right*. The radio network had "never invaded any such right of [the performer]; they have never copied his performances at all; they have merely used those copies which he and the [record company] made and distributed." *Id.* Therefore, the radio network could not be liable for broadcasting the records.

*Whiteman* established a longstanding "consensus that state law does not provide a public performance right for sound recordings." Ochoa, *supra*; *see* Steven Seidenberg, *US Perspectives: Courts Recognise New Performers' Rights*, INTELL. PROP. WATCH (Nov. 24, 2014), http://law.scu.edu ("As a result [of *Whiteman*], it has been settled since 1940 that there is no performance right in a sound recording."); Symposium, *The Semiconductor Chip Protection Act of 1984*,

9

70 MINN. L. REV. 579, 585-86 (1986) (*Whiteman* "turned the tide against judges creating" a "common law performers' right").[5]

The district court erroneously concluded that *Whiteman* is "no longer good law" based on *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955), and *Capitol Records, Inc. v. Naxos of Am., Inc.*, 830 N.E.2d 250 (N.Y. 2005). Ex. B at 43, 46. Those cases had nothing to do with performance rights. *Mercury Records* and *Naxos* were record piracy cases, and the courts held only that New York law gives sound recording owners the right to prevent the unauthorized duplication and distribution of bootleg copies. *Mercury Records*, 221 F.2d at 661-63; *Naxos*, 830 N.E.2d at 252, 266. This is consistent with *Whiteman*, which held

---

[5] *See also* Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 GEO. WASH. L. REV. 152, 155 (1974) (noting that *Whiteman* was "[t]he last reported case involving purported common law performing rights," and that "record companies have not tried to establish a public performance right through state legislation"); Sidney A. Diamond, *Sound Recordings and Phonorecords: History & Current Law*, 1979 U. ILL. L. F. 337, 347(1979) ("*Whiteman* stands for the principle that the sale of a record divests the production company or the performing artists of their rights, if any, to control its use."); Douglas G. Baird, *Common Law Intellectual Property & the Legacy of Int'l News Serv. v. Assoc. Press*, 50 U. CHI. L. REV. 411, 419 n.35 (1983) (noting that the "law did not (and in fact still does not) give a performer the right to control radio broadcasts of his performances"); U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS 44-45 (2011) (citing *Whiteman* and explaining that, although states could interpret common law as providing a performance right, "state law does not appear to recognize a performance right in sound recordings"); June M. Besek & Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J.L. & ARTS 327, 338 (2014) ("[S]tates do not appear to recognize a right of public performance in pre-1972 sound recordings….").

that the "only" common law right in sound recordings is "the power to prevent others from reproducing" them.  114 F.2d at 88.  Neither *Mercury Records* nor *Naxos* addressed whether there was a *performance* right under New York law.  In *Naxos*, the New York Court of Appeals—on certification from this Court—conducted a comprehensive review of the rights recognized in sound recordings yet made *no mention* of any performance right.  830 N.E.2d at 260-61.

     *Mercury Records* and *Naxos* addressed dictum in *Whiteman* that is not at issue here.  In dictum, Judge Hand considered whether the sale of a record was a "publication" that extinguished its common law copyright under federal preemption principles, and opined that after a record's sale, "anyone may copy it who chances to hear it, and may use it as he pleases."  114 F.2d at 89.[6]  *Mercury Records* held that this "statement … is not the law of the State of New York," as "public sale … does not constitute a dedication of the right to *copy and sell* the records."  221 F.2d at 663 (citing *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 796 (N.Y. Sup. Ct. 1950)) (emphasis added); *see Naxos*, 830 N.E.2d at 259-60.  *Mercury Records* and *Naxos* did not, however, disturb the central holding in *Whiteman* that is dispositive here: that there is no common law

---

[6] Judge Hand later acknowledged this statement was dictum, since copying was not at issue in *Whiteman*.  *Mercury Records*, 221 F.2d at 664; *see* Diamond, *supra*.

performance right.  As commentators have recognized, including *after Mercury Records* and *Naxos*, *Whiteman* remains good law on this point.[7]

The district court also misread *Whiteman* to suggest there *was* a performance right in sound recordings, because otherwise there would have been no reason for Judge Hand to address whether that right was forfeited by public sale.  But Judge Hand made clear his conclusion that public sale forfeits any common law copyright was independent from his conclusion that there is no performance right to begin with: "*Even if* Whiteman's 'common-law property' in his performances survived the sale of the records … the records themselves could not be clogged with a servitude," because "[c]opyright … consists *only* in the power to prevent others from *reproducing* copyrighted work."  114 F.2d at 88 (emphasis added).

## 2.    A Performance Right Can Only Be Created Legislatively.

Even apart from *Whiteman*, there is *no* case recognizing a performance right in sound recordings under New York law.  The district court's ruling thus dramatically expands the common law.  The court assumed that because New York cases have recognized performance rights in other creative works, such as plays and films, the same rights should exist in sound recordings.  Ex. A at 17, 19.

---

[7] *See supra* at 9-10 & n.5; Lauren E. Kilgore, *Guerrilla Radio: Has the Time Come for a Full Performance Right in Sound Recordings?*, 12 VAND. J. ENT. & TECH. L. 549, 559-60 (2010) (noting that *Whiteman* "helped put radio on solid legal ground to play records without compensating performers for the next seventy years," and confirming that *Mercury Records* overruled *Whiteman* only on a different issue).

Those cases are not analogous. Sound recordings involve different policy interests and stakeholders than other creative works. The interests of a sound recording owner—in most instances, the record company—in its performance conflict with the interests of other stakeholders, including the composer, performing artist, broadcaster, and user. *See* SUPP. REGISTER'S REP. ON THE GEN. REVISION OF U.S. COPYRIGHT LAW, 89th Cong. 51-52 (H. Comm. Print 1965) (proposed performance right in sound recordings opposed by composers and users). Giving owners the right to block and control public performances would harm the public and amount to a windfall at the expense of composers and performing artists, because any restrictions on such performances would decrease the number of times their songs are played and the consequent publishing royalties and publicity they receive. This would also harm broadcasters and users, who would face increased costs and decreased access to pre-1972 recordings.

It was because of this conflict that Congress expressly declined to create a performance right in sound recordings in the 1976 Copyright Act, even though it had recognized a performance right in musical compositions as early as 1897. Act of Jan. 6, 1897, ch. 4, 29 Stat. 481, 481-82; *see* Ex. A at 10-11, 21 n.3. Throughout the 1900s, various record executives testified before Congress in support of a performance right in sound recordings and admitted that no such right existed under the common law. *See, e.g.*, *Revision of Copyright Laws: Hearings Before*

13

*the H. Comm. on Patents*, *Revised Copy for Use of the Comm. on Patents*, 74th Cong. 622 (1936) ( "[T]he law up to date has not granted" protection against radio industry's "indiscriminate use of phonograph records."); *Copyright Law Revision: Hearing Before the Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary*, 90th Cong. 494, 496, 501-02 (1967) ("There is no clearly established legal remedy to stop this unauthorized use of our product.").  The issue was "explosively controversial," as the proposed performance right was opposed by "users who would have to pay additional royalties" and composers who "would probably get a smaller slice of the pie."  1965 SUPP. REGISTER'S REP., *supra*.

Against this backdrop, Congress decided *not* to create a performance right, in part because that would make the 1976 Copyright Act "so controversial that the chances of its passage would be seriously impaired."  *Id.*  The *only* rights in sound recordings the Act recognized were the rights to prevent unauthorized duplication and distribution of post-1972 recordings.  Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971).[8]

---

[8] The district court stated that "if public performance rights were not part of the normal bundle of rights in a copyright, Congress would not have needed to carve out an exception specifically for sound recordings."  Ex. A at 21.  But the legislative history is clear that there was no performance right.  Congress included the carve-out to distinguish sound recordings from other copyrighted works, which enjoy the complete "bundle of rights" provided by 17 U.S.C. § 106, including a specific public performance right.

Congress ultimately did create a limited performance right for *post*-1972 sound recordings in the 1995 Digital Performance Right Act, but only after careful legislative deliberation. Congress drafted this Act after dozens of witnesses testified about the competing policy considerations, after committees produced multiple reports detailing their findings, and after Congress had revised the Act to address each issue. *See* H.R. REP. NO. 104-274 (1995); S. REP. NO. 104-128 (1995). The Act included key limitations, including an exemption for AM/FM radio stations. *Id.* And Congress put into place a complex compulsory licensing arrangement along with specific mechanisms to set licensing rates and transmit payments, including a requirement that the record companies share one-half of the compulsory license fees with the musicians and singers who created the recordings instead of pocketing the money for themselves. *See* H.R. REP. NO. 104-274, at 14-15, 24. There has been no judicial counterpart to this legislative process, and there would be no common law basis on which it could rest.

As a federal court sitting in diversity, the district court's role was to predict how the New York Court of Appeals would rule on the performance-right issue. Ex. A at 16 (citing *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1153 (2d Cir. 1989)). New York law is clear that where the creation of a right would require a departure from the common law and affect complex social relationships, such as the competing stakeholder interests at issue here, creating

15

that right "*must be the doing of the Legislature*."  *Chamberlain v. Feldman*, 300

N.Y. 135, 139-40 (1949) (emphasis added); *see Campaign for Fiscal Equity, Inc.*

*v. New York*, 8 N.Y.3d 14, 28 (2006) ("[T]he manner by which the State addresses

complex societal ... issues is a subject left to the discretion of the political branches

of government."); *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,

92 N.Y.2d 458, 467-68 (1998) (common law should develop "at a snail-like pace"

to avoid "encroachment on the legislative branch").

The reason for this principle is clear: the creation of a controversial new

right by courts rather than legislatures engenders widespread policy and

administrative problems.  As the district court acknowledged, the common law

right it created is far "broader than the right legislated by Congress," as it

encompasses AM/FM radio and contains none of the exemptions or limitations of

the 1995 Act.  Ex. A at 24.  And because there is no legislative scheme to guide the

enforcement of this new common law right, the court's ruling creates substantial

administrative problems, which will ultimately increase consumer costs and

decrease access to pre-1972 recordings.[9]  *Id.*  These complex policy tradeoffs and

administrative issues should be addressed by a legislature, not a district court.

---

[9] The Copyright Office recently issued a report discussing this case and noting the
policy problems that result from the creation of a common law performance right.
*See* U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE 53-55,
85-87 (2015) ("federal licensing scheme" preferable to "scattered state laws"

**C.     Interlocutory Appeal Would Materially Advance the Litigation.**

The district court rightly concluded that interlocutory appeal would

"materially advance the ultimate termination of the litigation."  Ex. C at 57.

Section 1292(b) does not "require[] that the interlocutory appeal have a final,

dispositive effect on the litigation, only that it 'may materially advance' the

litigation."  *Reese v. BP Exploration Inc.*, 643 F.3d 681, 688 (9th Cir. 2011);

*accord Klinghoffer*, 921 F.2d at 24.

As discussed above, if this Court reverses, that could "dispose of the entire

case."  Ex. C at 55.  This would also avoid "cumbersome class-wide discovery, a

motion for certification, and ultimately a decision on damages."  *Id.* at 59.  *See*

*Figueiredo Ferraz Consultoria E Engenharia de Projecto LTDA. v. Republic of*

*Peru*, 665 F.3d 384, 389 n.6 (2d Cir. 2011) (interlocutory review may be warranted

to promote judicial economy).  Even if this Court were to affirm, that would

materially advance the litigation because the parties could then proceed to address

"the thorny but ultimately soluble issue of how to license and compensate public

performances" of pre-1972 recordings.  Ex. C at 57.

---

because a federal scheme would "offer uniform protection to [sound recording]
owners as well as appropriate exceptions and limitations for the benefit of users").

## II. INTERLOCUTORY APPEAL IS ALSO WARRANTED TO DETERMINE WHETHER NEW YORK COMMON LAW IS SUBJECT TO COMMERCE CLAUSE SCRUTINY.

The district court recognized that its Commerce Clause ruling presents a "controlling" question of law, resolution of which "could materially advance the resolution of this lawsuit" for the reasons discussed above. Ex. C at 58. The court's conclusion that there is not substantial ground for difference of opinion on its ruling was incorrect. The district court held that New York's property law is not a state "regulation" subject to Commerce Clause scrutiny. Ex. A at 37-39; Ex. B at 48. This directly contradicts case law establishing that a "regulation is not necessary for asserting a dormant Commerce Clause claim." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1217 (9th Cir. 2003). Rather, the Supreme Court has established that *any* exercise of state power—including a court's application of state property law—can violate the Commerce Clause. *See BMW*, 517 U.S. at 572 n.17 ("State power may be exercised as much by a jury's [or judge's] application of a state rule of law in a civil lawsuit as by a statute.").

Had the district court addressed the merits of Sirius XM's Commerce Clause argument, it would have found a violation. Sirius XM broadcasts to millions of subscribers across the country through satellite radio and internet streaming, and the radio receivers, mobile devices, and computers that subscribers use to access those broadcasts are routinely transported across state lines. Sirius XM, moreover,

is required by the FCC to broadcast uniformly nationwide.[10]  The practical effect of applying a New York performance right to Sirius XM would thus be to require Sirius XM to comply with New York law nationwide, which would *per se* violate the Commerce Clause.  *See Healy v. Beer Institute, Inc.*, 491 U.S. 324, 337 (1989) ("[A] state law that has the 'practical effect' of regulating commerce occurring wholly outside the State's borders is invalid."); *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103-04 (2d Cir. 2003) (*per se* violation of Commerce Clause to apply Vermont statute to certain types of "internet speech" that have no "geographic boundaries"); *NCAA v. Miller*, 10 F.3d 633, 638-40 (9th Cir. 1993) (*per se* violation of Commerce Clause to apply Nevada statute imposing due process requirements on NCAA, which adheres to nationally uniform program).

Applying a New York performance right to Sirius XM would also impose an undue burden under the balancing test set forth in *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970) (if a state law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits").  There is no New York-specific interest in providing performance rights to owners of pre-1972

---

[10] *See, e.g.*, 47 C.F.R. § 25.144(e)(4) (requiring that broadcasts be "restricted to the simultaneous retransmission of the complete programming"); 23 FCC Rcd 12348 ¶ 155 (2008) ("prohibit[ing]" Sirius XM from "distribut[ing] localized content that is distinct from that provided to subscribers nationwide via satellite").

recordings across the country.  Other states *reject* any such right, *see supra* at 9-10; N.C. GEN. STAT. § 66-28 ("abolish[ing] any common-law rights" in sound recordings); S.C. CODE ANN. § 39-3-510 (same), and Sirius XM is prohibited from tailoring its broadcasts to specific states.  Requiring Sirius XM to comply with New York law on a national basis would impose a tremendous burden that far outweighs any interest New York might have.

If this Court grants interlocutory review, Sirius XM will argue that this Court should reverse the district court's ruling that New York common law is immune from Commerce Clause scrutiny, and either find a violation or remand so the court can conduct the Commerce Clause analysis in the first instance.

## CONCLUSION

This Court should grant Sirius XM's petition and allow an interlocutory appeal of the district court's November 14, 2014 and December 12, 2014 orders.

Dated:          February 20, 2015          O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
          Daniel M. Petrocelli
          Robert M. Schwartz
          Victor H. Jih
          1999 Avenue of the Stars, 7th Floor
          Los Angeles, CA  90067-6035
          Telephone:     (310) 553-6700
          Facsimile:     (310) 246-6779

*Attorneys for Petitioner Sirius XM Radio Inc.*

20

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel M. Petrocelli, a member of the Bar of this Court, hereby certify that

on February 20, 2015, I caused a true and correct copy of the foregoing PETITION

FOR PERMISSION TO APPEAL PURSUANT TO 28 U.S.C. § 1292(b) AND

FEDERAL RULE OF APPELLATE PROCEDURE 5 to be served via Electronic

Mail and by personal service on counsel of record at the following address:

> Gradstein & Marzano
> Henry D. Gradstein
> hgradstein@gradstein.com
> Maryann R. Marzano
> mmarzano@gradstein.com
> Harvey W. Geller
> hgeller@gradstein.com
> 6310 San Vicente Blvd., Ste. 510
> Los Angeles, CA 90048

Dated:        February 20, 2015                  /s/ Daniel M. Petrocelli
                                                      Daniel M. Petrocelli

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

FLO & EDDIE, INC.,

        Plaintiff,

    -against-

SIRIUS XM RADIO, INC., and DOES 1-10,

        Defendants.

---------------------------------------------------------------x

No. 13 Civ. 5784 (CM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/14/14

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

    Plaintiff Flo & Eddie, Inc. ("Flo and Eddie") brings this putative class action suit against Defendant Sirius XM Radio, Inc. ("Sirius"). The complaint alleges that Sirius committed common law copyright infringement and engaged in unfair competition by publicly performing sound recordings owned by Flo and Eddie, and by reproducing those recordings in aid of its performances. Before the Court is Docket #46, Sirius's motion for summary judgment. For the reasons stated below, the motion is **DENIED**.

    Furthermore, it appears to the Court that there are no disputed issues of material fact as to liability. Sirius is therefore **ORDERED** to show cause by December 5, 2014, why summary judgment should not be entered in favor of Flo and Eddie as to liability only. *See* FED. R. CIV. P. 56(f)(1).

1

# BACKGROUND

## I. Factual Background

### A. The Parties

Flo and Eddie is a California corporation, wholly owned by its principals, Mark Volman ("Volman") and Howard Kaylan ("Kaylan"). (Sirius 56.1 Statement ¶¶ 1-2; Volman Decl. ¶ 1.) Volman and Kaylan are two of the original members of The Turtles ("the Turtles"), a 1960s rock group whose hits included "Happy Together" and a cover of Bob Dylan's "It Ain't Me Babe." (Sirius 56.1 Statement ¶ 16; Flo and Eddie 56.1 Statement ¶¶ 2-3.)

Master recordings of the Turtles' performances – all of which were made prior to February 15, 1972 – were originally held by White Whale Records. (Sirius 56.1 Statement ¶¶ 1, 17; Flo and Eddie 56.1 Statement ¶¶ 3, 5; Volman Decl. ¶ 2.) White Whale transferred those recordings to the Turtles' members as part of a legal settlement. (Sirius 56.1 Statement ¶ 18; Flo and Eddie 56.1 Statement ¶ 5.) Volman and Kaylan purchased the remaining Turtles' members' interests in the recordings, and ultimately transferred all ownership interests in the recordings to Flo and Eddie. (Sirius 56.1 Statement ¶¶ 19-20; Flo and Eddie 56.1 Statement ¶¶ 6-7.)

Sirius is a Delaware corporation engaged in the satellite radio business. (Sirius 56.1 Statement ¶ 3.) Sirius provides digital audio content to its subscribers, who pay a periodic fee. (Geller Decl., Ex. 6.) Subscribers can receive audio content in several ways. Many subscribers – a majority according to Sirius – use special digital radios installed in their vehicles. (Sirius 56.1 Statement ¶ 5; Smith Decl. ¶ 4.) Other subscribers stream the same programming over the internet to a computer or mobile device. (Sirius 56.1 Statement ¶ 6; Flo and Eddie 56.1 Statement ¶ 14; Smith Decl. ¶ 6; *see* Smith 2/11/14 Dep. Tr. at 194:22-25.) Some users receive Sirius's music programming through Dish Network set-top boxes. (Sirius 56.1 Statement ¶ 6; Flo and Eddie 56.1 Statement ¶ 3; Smith Decl. ¶ 6; Smith 2/11/14 Dep. Tr. at 224:22-226:5.) Businesses can also

2

receive music broadcasts to play in their retail establishments through Sirius's "Business Establishment Service." (Sirius 56.1 Statement ¶ 6; Smith Decl. ¶ 6.)

Sirius offers a diverse set of programming including talk radio, live sports coverage, and music. (Sirius 56.1 Statement ¶ 4.) Music programming is featured on dozens of Sirius channels. (Geller Decl., Ex. 7.) Many of those channels – for example "60s on 6" or "70s on 7" – broadcast pre-1972 sound recordings. (Flo and Eddie 56.1 Statement ¶ 13.) Some of those channels have broadcast Turtles sound recordings. (*See, e.g.*, Sirius 56.1 Statement ¶¶ 21-22; Smith Decl. ¶¶ 12-13.) Both Sirius subscribers and users those who receive Sirius content through Dish Network set-top boxes can listen to programming that features pre-1972 sound recordings. (Smith 2/11/14 Dep. Tr. at 226:6-18.)

Sirius acknowledges that it "perform[s]" sound recordings, including pre-1972 sound recordings, by broadcasting them over its satellite radio network and streaming them over the internet. (Smith 3/12/14 Dep. Tr. at 96:21-97:15.) The pre-1972 sound recordings Sirius has performed include Turtles recordings. (Smith 3/12/14 Dep. Tr. at 104:8-105:9.) Sirius does not currently know how many pre-1972 recordings it has performed, or how many times it has performed Turtles recordings. (Smith 3/12/14 Dep. Tr. at 97:16-25, 105:11-22.)

## B. Sirius's Operations

To understand Flo and Eddie's claims, one has to understand a bit about the technical aspects of Sirius's operations. Sirius stores its permanent digital music library on three databases, named "Prophet," "Dalet 5.1," and "Dalet Plus." (Sirius 56.1 Statement ¶¶ 24-26; Smith Decl. ¶ 17; Smith 2/11/14 Dep. Tr. at 154:2-8.) The Prophet database is located in New York City, and the two Dalet databases are located in Washington, D.C. (Sirius 56.1 Statement ¶¶ 25-26; Smith Decl. ¶¶ 18-19.) Sirius maintains onsite backup copies of each database, as well as offsite disaster recovery copies of the Prophet database in New Jersey, and of the Dalet databases in Georgia.

3

(Sirius 56.1 Statement ¶¶ 25-26; Flo and Eddie 56.1 Statement ¶ 18; Smith Decl. ¶¶ 18-19; Smith 2/11/14 Dep. Tr. at 154:11-155:23, 156:15-157:7.)

The content of the three databases overlaps imperfectly. (Smith 2/11/14 Dep. Tr. at 156:7-14.) Some recordings may be stored on all three databases. Other recordings might be stored only on Prophet, while others may be stored only on the Dalet databases. (Smith 2/11/14 Dep. Tr. at 75:12-76:13.) Each database stores copies of pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 159:24-160:9; Smith 3/12/14 Dep. Tr. at 38:6-40:6.) At least 18,000 such copies are stored on the Prophet database, and at least 24,000 are stored on each of the Dalet databases. (Flo and Eddie 56.1 Statement ¶ 17; Smith 3/12/14 Dep. Tr. at 40:8-42:15, 43:15-44:19; *see* Smith 3/12/14 Dep. Tr. at 61:19-62:11.) The Prophet database in New York contains 14 Turtles recordings, while the Dalet databases in Washington, D.C., contain 71 such recordings. (Sirius 56.1 Statement ¶¶ 29-30; *see* Flo and Eddie 56.1 Statement ¶ 16; Smith Decl. ¶¶ 23-24.) The backup and disaster recovery databases, like the Dalet and Prophet databases also contain pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 73:9-24.)

In addition to its three main databases, Sirius stores subsets of its music library on smaller databases at off-site locations. (Sirius 56.1 Statement ¶ 33; Flo and Eddie 56.1 Statement ¶ 18; Smith Decl. ¶ 27.) Specifically, Sirius maintains recordings from the Prophet database on smaller databases in Nashville, Orlando, and Boston. (Smith 2/11/14 Dep. Tr. at 158:17-21, 159:6-9.) Recordings from the Dalet databases reside on databases in Cleveland, Austin, and Los Angeles. (Sirius 56.1 Statement ¶ 33; Smith 2/11/14 Dep. Tr. at 158:22-159:5.) These smaller databases are used to produce on-location shows tailored to a particular musical style or on-air talent. (Smith 2/11/14 Dep. Tr. at 158:17-159:9, 163:4-21.) Some of these databases contain pre-1972 recordings, and the Cleveland database contains at least one Turtles recording. (Sirius 56.1 Statement ¶ 33;

4

Smith 2/11/14 Dep. Tr. at 160:9-161:25, 162:25-163:3, 164:12-23; Smith 3/12/14 Dep. Tr. at 51:11-54:4.)

Sirius has also copied some recordings to a database that it transferred to Omnifone, a UK-based firm that operates the My SXM service, described below. (Sirius 56.1 Statement ¶ 35; Flo and Eddie 56.1 Statement ¶ 29; Smith 2/11/14 Dep. Tr. at 33:25-34:16, 165:4-11; Smith 3/12/14 Dep. Tr. at 107:15-21.) Although the parties agree that Omnifone continues to possess those copies, Sirius claims that Omnifone can use them only for a very limited purpose: to provide the customized My SXM service. (Sirius 56.1 Statement ¶ 35; Smith 2/11/14 Dep. Tr. at 35:9-25.) The database transferred to Omnifone contains pre-1972 recordings, including Turtles recordings. (Sirius 56.1 Statement ¶ 35; Smith Decl. ¶¶ 27, 29; Smith 2/11/14 Dep. Tr. at 165:7-15; Smith 3/12/14 Dep. Tr. at 54:22-55:14.)

Several hours before Sirius plays a sound recording on one of its programs, it creates an additional copy of the recording on its "play-out server." (Sirius 56.1 Statement ¶ 37; Flo and Eddie 56.1 Statement ¶ 20; Smith Decl. ¶ 31; Smith 2/11/14 Dep. Tr. at 19:5-16.) Content is broadcast directly from the play-out server; the copy ensures a smooth broadcast even if there is a network disruption. (Sirius 56.1 Statement ¶ 37; Smith Decl. ¶ 31; *see* Smith 2/11/14 Dep. Tr. at 114:15-116:16.) The copy on the play-out server is deleted once a recording is broadcast. (Sirius 56.1 Statement ¶ 37; Smith Decl. ¶ 31.) Each time a recording is performed, a new copy is created on the play-out server. (Smith 2/11/14 Dep. Tr. at 117:9-11; Smith 3/12/14 Dep. Tr. at 89:2-7.) Because Sirius has performed pre-1972 recordings, including Turtles recordings, it has necessarily copied those recordings to its play-out server – many times, in fact. (Smith 3/12/14 Dep. Tr. at 88:2-20, 91:5-16.) But Sirius does not know how many copies of those recordings have been made on its play out server (Smith 3/12/14 Dep. Tr. at 89:8-91:4.)

5

To deliver content through its streaming service, Sirius employs a third party, Akami. (Smith 2/11/14 Dep. Tr. at 176:5-11; Smith 3/12/14 Dep. Tr. at 108:3-21.) Sirius sends a signal of its programming to Akami; Akami in turn makes several temporary copies of the recordings that Sirius sends it in order to facilitate its content distribution operation. (Smith 2/11/14 Dep. Tr. at 177:21-178:11.) Pre-1972 recordings are included in the programming that Sirius broadcasts and Akami copies. (Smith 3/12/14 Dep. Tr. at 46:17-20.)

Sirius makes additional complete of recordings it has broadcast for its "Start Now" service.[1] (*See* Sirius 56.1 Statement ¶ 39; Flo and Eddie 56.1 Statement ¶¶ 15, 22, 29; Geller Decl., Ex. 5; Smith Decl. ¶ 33.) Start Now is a time-shifting feature. It allows users to start from the beginning (up to five hours earlier) a program that Sirius is currently broadcasting. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33; Smith Decl. ¶ 33.) To provide this service, Sirius keeps a running cache of its broadcasts. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33.) The cache is continually updating to store the most recent five hours – earlier data is overwritten on a first-in-first-out basis. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33.) Sirius acknowledges that copies of pre-1972 recordings have been cached for the Start Now feature. (Smith 2/11/14 Dep. Tr. at 214:9-12.)

Separately from the Start Now feature, Sirius also authorizes Quick Play, a third party, to maintain a five hour cache of Sirius programming. (Smith 2/11/14 Dep. Tr. at 179:5-17, 193:16-19.) Quick Play's role, performed in conjunction with Akami, is to deliver Sirius content to mobile devices. (Smith 2/11/14 Dep. Tr. at 179:23-180:4.) As with the Start Now cache, Quick Play has included pre-1972 recordings in its five-hour cache. (Smith 2/11/14 Dep. Tr. at 214:9-19.)

---

[1] Flo and Eddie describes the five-hour time-shifting as Sirius's "On Demand" feature. Although the parties are not entirely clear, it appears that "On Demand" and "Start Now" are separate features. The allegedly unauthorized copy made for time-shifting purposes is properly referred to as "Start Now." (*See* Geller Decl., Ex. 8; Smith Decl. ¶ 33.)

6

In aid of broadcasting, Sirius also makes partial copies of some recordings, known as "tips-and-tails" copies. (Sirius 56.1 Statement ¶ 36; Flo and Edie 56.1 Statement ¶ 19; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 18:4-25.) These copies contain the final few seconds of one recording and the first few seconds of the recording set to play after it. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 52:20-53:25.) Hosts of Sirius programs use the tips-and-tails copies to properly time voice-overs in which they will, for example, announce the titles of the recording that just played and the one about to play. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 18:4-25.) A host will pre-record voice-overs against the background of the tips-and-tails recording to ensure that a voice-over does not bleed over too far into the body of a recording. After the voice-over is recorded, the tips-and-tails copy is deleted. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 55:5-56:10.) (There appears to be one exception. The smaller regional "Margaritaville" database retains permanent copies of tips-and-tails recordings. (Smith 2/11/14 Dep. Tr. at 83:2-84:6.)) Partial copies of pre-1972 recordings, including Turtles recordings, have been made for tips-and-tails purposes. (Smith 2/11/14 Dep. Tr. at 56:11-18; Smith 3/12/14 Dep. Tr. at 80:11-81:4, 82:14-20, 84:8-21.) But Sirius does not know exactly how many such copies have been made. (Smith 3/12/14 Dep. Tr. at 81:6-82:13.)

The most contentious factual dispute between the parties concerns buffering, which Flo and Eddie describes as "progressive downloading." (Flo and Eddie 56.1 Statement ¶¶ 30-31; Smith 2/11/14 Dep. Tr. at 203:18-204:10.) Buffering, in general, refers to storing a small segment of audio or video content in computer memory to ensure smooth playback. Sirius's content is buffered at several points. Sirius buffers for four seconds at the "earth station," where content is uplinked to a satellite. (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32; Smith 2/11/14 Dep. Tr. at 119:12-

7

120:2.) The four second buffer allows Sirius to send two separate signals to its satellites. A user's radio can then substitute one transmission for another if a connection is momentarily blocked, so that playback will not be interrupted. (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32.) The satellites then send back the two signals, where they are received by a "terrestrial repeater." (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32; Smith 2/11/14 Dep. Tr. at 93:12-15.) The terrestrial repeaters buffer the first signal received until they receive the second signal, generally on the order of a few milliseconds later. (Smith 2/11/14 Dep. Tr. at 93:16-94:3, 135:18-136:25.) Finally, Sirius digital radios store signals they receive in memory, creating a four-second buffer at the point where subscribers listen to content. (Smith 2/11/14 Dep. Tr. at 96:3-97:7, 111:15-112:10; *see* Smith 2/11/14 Dep. Tr. at 137:14-18 (noting that there are two distinct four-second buffers).)

Some individual radio receivers create a buffer of up to 30 minutes on a channel to which a subscriber is listening. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) That buffer allows users to "replay" a few minutes of a show they miss. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) The replay buffer is overwritten on a rolling first-in, first-out basis and is erased if a user changes the channel or turns off the radio. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) Finally, mobile phones or other internet-connected devices also create a buffer when they stream Sirius's content. (Sirius 56.1 Statement ¶ 43; Smith Decl. ¶ 34.) Because buffers are created any time Sirius broadcasts a recording, Sirius has of course created buffers of pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 138:7-13.)

Flo and Eddie emphasizes that every second of a buffered recording will, at some point, be cached in the buffer, even if no complete copy is ever created. Sirius stresses that buffers are constantly adding new data and removing old data. At any one time, a buffer contains at most a few seconds of content, which may include portions of more than one recording.

The long and short of this is – Sirius makes multiple copies, temporary, permanent, whole or partial, during its broadcast process; and it performs the copies it makes. Furthermore, as to pre-1972 sound recordings, it does so without obtaining licenses or paying royalties. Sirius has not obtained a license to copy most of the pre-1972 recordings stored in its various databases. (Frear 3/12/14 Dep. Tr. at 77:20-79:25.) Nor has Sirius obtained licenses to perform most of those recordings over the internet, (Frear 3/12/14 Dep. Tr. at 80:2-21), or to authorize third parties Omnifone or Akami to stream its programming. (Frear 3/12/14 Dep. Tr. at 90:11-91:5.) Sirius has not paid royalties to copy or perform most of its pre-1972 recordings. (Frear 3/12/14 Dep. Tr. at 69:10-16.)

For all the copying it does do, it's worth noting what Sirius does not do. Sirius does not currently allow users to download and store complete copies of any recordings. (Sirius 56.1 Statement ¶¶ 24, 40, 41, 43; Smith Decl. ¶ 14.) In this way, Sirius differs from file-sharing services such as Napster and Limewire. (Sirius 56.1 Statement ¶ 41; Smith Decl. ¶ 14.)

Nor does Sirius allow users to listen to a particular recording whenever they choose to do so. In this way, Sirius differs from some internet radio services like Spotify. (Sirius 56.1 Statement ¶ 41; Smith Decl. ¶ 14.) Users can customize the programming they receive to a limited extent using the "My SXM" feature. (Sirius 56.1 Statement ¶ 35; Flo and Eddie 56.1 Statement ¶ 15; Geller Decl., Ex. 8; Smith Decl. ¶ 28.) For example, a user could choose to emphasize folk music and deemphasize rock music on a 70s channel. But that user could not choose to listen only to Bob Dylan, much less a particular Bob Dylan recording, while excluding anything by Led Zeppelin. (*See* Sirius 56.1 Statement ¶ 41; Smith Decl. ¶¶ 14, 28.)

9

## II.    Procedural Background

Flo and Eddie filed its initial complaint on August 16, 2013. (Docket #1.) In response to a motion to dismiss filed by Sirius, Flo and Eddie filed an amended complaint on November 13, 2013. (Docket #32.)

Flo and Eddie has filed companion suits in California and Florida. (*See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-23182 (S.D. Fla.); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-05693 (C.D. Cal.)). In each case, Flo and Eddie has asserted state-law claims under the law of the state in which the suit was filed. The district court in the California suit granted Flo and Eddie's motion for summary judgment as to liability. The district court in the Florida suit has not yet issued a decision on a pending motion by Flo and Eddie for summary judgment as to liability.

To understand why Flo and Eddie seeks relief under state law, one has to know a bit about federal copyright law. Since 1831, federal law has protected copyrights in musical compositions. *See* 17 U.S.C. § 102(a)(2); Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436. "The creator of a musical composition has long had a right of exclusive public performance of that musical piece." *Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 487 (3d Cir. 2003). Thus, when radio stations publicly perform – that is, broadcast – copyrighted musical compositions, they pay royalties to the holder of the copyright in the song – generally the composer or his heirs – for the privilege of doing so. *Woods v. Bourne Co.*, 60 F.3d 978, 983-84 (2d Cir. 1995). Those royalties are typically collected and distributed by professional clearinghouses, such as the American Society of Composers, Authors and Publishers ("ASCAP"). *Id.*; *see Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 4-5 (1979) (describing ASCAP).

A copyright in a musical composition is *not* same as a copyright in a sound recording of a performance of that composition. And this lawsuit not about musical compositions. (Pl. Opp.

10

Mem. at 10 n.6.) As far as the Court is aware, Sirius pays royalties to the holder of the copyright for the right to perform the Turtles' musical compositions.

This suit is about copyright in sound recordings, which is a different animal. A sound recording is a medium in or on which a particular performance of a musical composition (song) is fixed for posterity and for playback. *See* 17 U.S.C. § 101. In essence, a copyright in a sound recording is a copyright in the performance – not in the work being performed.

Congress only made sound recordings eligible for federal statutory copyright protection in 1971. *See* Sound Recordings Act, Pub. L. No. 92-140, 85 Stat. 391 (1971). Furthermore, that protection was limited in two important ways.

First, Congress did not originally provide sound recording copyright holders with an exclusive right to publicly perform their works. *Bonneville Int'l Corp.*, 347 F.3d at 487. Thus, the owners of copyrights in sound recordings, unlike copyright holders in musical compositions were not entitled to compensation under federal law when radio stations broadcast their recordings between 1972 and 1995. *Id.* In 1995, Congress added a limited public performance right for sound recordings, giving holders of sound recording copyrights the "exclusive right[] . . . to perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. § 106. Federal copyright law still provides no exclusive right to public performance of sound recordings by any other means. *See Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 153-54 (2d Cir. 2009).

The second important limitation of the 1971 Act was that it operated prospectively. Recordings "fixed" (recorded) prior to February 15, 1972 were not, and still are not, eligible for federal copyright protection. *See* 17 U.S.C. § 301(c). The Turtles recordings were all fixed before February 15, 1972. Therefore, none is eligible for federal copyright protection.

11

Instead of adopting a federal copyright scheme for pre-1972 sound recordings, Congress left the issue to the states. For works protected by federal law, Congress broadly preempted any "equivalent right in any such work under the common law or statutes of any State." *Id.* § 301(a). For sound recordings fixed before February 15, 1972, however, Congress expressly did "not . . . annul[] or limit[]" "any rights or remedies under the common law or statutes of any State." *Id.* § 301(c).

Flo and Eddie argues that New York provides pre-1972 sound recording owners with rights and remedies under its common law. Flo and Eddie further argues that New York's common law copyright protection, which extends to pre-1972 sound recordings, prohibits both reproducing and publicly performing those recordings. It also argues the law of unfair competition provides similar protection.

Sirius has moved for summary judgment. (Docket #46.) It argues that: (1) New York common law copyrights in pre-1972 sound recordings do not afford an exclusive right of public performance; (2) the copies Sirius made of Turtles recordings are protected by fair use; (3) sustaining Flo and Eddie's claims would violate the Dormant Commerce Clause; and (4) Flo and Eddie's entire action is barred by the doctrine of laches.

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see* FED. R. CIV. P. 56(a), (c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

12

-12-

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. "Summary judgment is designed . . . to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

## II.    Sirius Cannot Invoke the Defense of Laches

Sirius argues that Flo and Eddie's entire suit is barred by the defense of laches. But it is not.

"The defense of laches is unavailable in [an] action at law commenced within the period of limitations." *Cadlerock, L.L.C. v. Renner*, 898 N.Y.S.2d 127, 128 (App. Div. 2010); *see Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 499 (S.D.N.Y. 2005); *Coit v. Campbell*, 82 N.Y. 509, 512-13 (1880). Flo and Eddie has brought an action at law for damages. Flo and Eddie's unfair competition claim – grounded in misappropriation – is subject to a three-year statute of limitations. *Sporn v. MCA Records, Inc.*, 451 N.Y.S.2d 750, 751 (App. Div. 1982) *aff'd*, 58 N.Y.2d

13

482 (1983). The claim for common law copyright infringement is also an action at law, *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *Bercovici v. Chaplin*, 7 F.R.D. 61, 62 (S.D.N.Y. 1946), subject to a six year statute of limitations. *Capitol Records, LLC v. Harrison Greenwich, LLC*, 986 N.Y.S.2d 837, 838 (Sup. Ct. 2014). Flo and Eddie seeks damages on both claims, and Sirius does not argue that they are brought outside the applicable statutes of limitations. Thus, those claims are not barred by laches.

Nor does laches bar Flo and Eddie's prayer for an injunction. That request "for an equitable remedy" is made "in aid of or to enforce a legal right." *Bohemian Brethren Presbyterian Church v. Greek Archdiocesan Cathedral of Holy Trinity*, 405 N.Y.S.2d 926, 929 (Sup. Ct. 1978) *aff'd*, 416 N.Y.S.2d 751 (App. Div. 1979) (citing *Galway v. Metro. Elevated Ry. Co.*, 128 N.Y. 132 (1891)). In that situation, the defense of laches is similarly unavailable. The statute of limitation controls both the legal action for damages and the equitable remedy. *Id.*; *see Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177, at *8 & n.87 (S.D.N.Y. Oct. 11, 2005).

## III. Flo and Eddie Holds the Valid Common Law Copyright in the Turtles' Sound Recordings

As explained above, federal law provides copyright protection for sound recordings fixed on or after February 15, 1972. *See* 17 U.S.C. §§ 102(a)(7), 301(c). As to those sound recordings, Congress broadly preempted equivalent state-law protections. *Id.* § 301(a). Federal law does not, however, provide copyright protection for sound recordings fixed before February 15, 1972. Furthermore, Congress expressly declined to preempt whatever common law copyright protection was provided to those recordings by state law until February 15, 2067. *Id.* § 301(c).

New York has elected to "fill th[e] void" Congress left, by continuing to enforce its preexisting body of copyright common law for pre-1972 sound recordings. *Capitol Records, Inc.*

14

*v. Naxos of Am., Inc.* (*Naxos*), 4 N.Y.3d 540, 559-60, 565 (2005); *see Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 662-63 (2d Cir. 1955); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995). Under that law, artists can acquire a common law copyright in "any original material product of intellectual labor" *A.J. Sandy, Inc. v. Junior City, Inc.*, 234 N.Y.S.2d 508, 510 (App. Div. 1962) – including sound recordings – by expending "time, effort, money, and great skill" in its creation. 104 N.Y. JUR. 2D TRADE REGULATION § 262; *see RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 88 (2d Cir. 1940). The term "any original material product of intellectual labor" includes sound recordings. *See, e.g.*, *Capitol Records, Inc. v. Greatest Records, Inc.*, 252 N.Y.S.2d 553, 554-55 (Sup. Ct. 1964); *Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492-93 (Sup. Ct. 1950) *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951).

The Turtles originally acquired a common law copyright in their sound recordings by expending time, effort, money and skill to create them. That copyright was then transferred to White Whale, and eventually to Flo and Eddie, which now owns the sound recordings. Sirius does not contest Flo and Eddie's claim to possess a common law copyright in the Turtles recordings (though it insinuates that some of the underlying ownership transfers are undocumented). Rather, Sirius contends that Flo and Eddie's rights as holder of the copyright in the sound recordings does not give them the exclusive right to publicly perform those works.

## IV.    Flo and Eddie's Common Law Copyright Provides Exclusive Rights to Reproduce and Publicly Perform Turtles Recordings

Flo and Eddie alleges that Sirius has infringed its common law copyright by (1) reproducing (making copies of) the master recordings, and (2) performing those recordings (or the illicit copies of them) publicly.

15

New York unquestionably provides holders of common law copyrights in sound recordings with an exclusive right to reproduce those recordings. *See Capitol Records*, 221 F.2d at 663; *Naxos*, 4 N.Y.3d at 559-60, 563-64. Sirius does not challenge that proposition, although it argues that its reproductions of Turtles sound recordings constitute fair use. That issue will be discussed below.

Whether New York provides holders of common law copyrights in sound recordings with an exclusive right to publicly perform those recordings presents a much thornier question – one of first impression, and one that has profound economic consequences for the recording industry and both the analog and digital broadcast industries. My first task is to predict how I believe the New York Court of Appeals would rule on this question, which no appellate court in New York has yet confronted. *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F. 2d 1146, 1153 (2d Cir. 1989).[2]

I conclude that the New York Court of Appeals would recognize the exclusive right to public performance of a sound recording as one of the rights appurtenant to common law copyright in such a recording.

"In general, the rights under common law copyright . . . are at least co-extensive with the rights commanded under the Copyright Act." 2 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 8[C][2] (Matthew Bender, Rev. Ed.). But when New York first recognized common law copyrights in sound recordings – over 50 years ago – Congress had not yet authorized any federal copyright protection for sound recordings. *Naxos*, 4 N.Y.3d at 560.

---

[2] One very recent decision of the New York State Supreme Court appears to recognize just the sort of public performance right that Sirius says does not exist. *See Capitol Records, LLC v. Harrison Greenwich, LLC*, 984 N.Y.S.2d 274, 275-76 (Sup. Ct. 2014); Decision and Order, *Capitol Records, LLC v. Harrison Greenwich, LLC*, No. 652249/2012 (N.Y. Sup. Ct. May 13, 2014). But that Decision and Order does not explain its ruling and cites no prior case law recognizing any public performance right in sound recordings, so I can take no guidance from it.

16

Thus, the protections New York common law offers to holders of copyrights in sound recordings cannot be determined by reference to comparable federal protection. Instead, I must look to the background principles and history of New York copyright common law. *See id.* at 546 ("[W]hen examining copyright law, a page of history is worth a volume of logic." (internal citations and quotation marks omitted)).

The common law typically "protects against unauthorized reproduction of copies or phonorecords, unauthorized distribution by publishing or vending, *and unauthorized performances.*" 2 NIMMER ON COPYRIGHT § 8[C][2] (internal citations omitted) (emphasis added); *see Letter Edged in Black Press, Inc. v. Pub. Bldg. Comm'n of Chicago*, 320 F. Supp. 1303, 1308 (N.D. Ill. 1970); *cf. Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F. 3d 73, 81 (2d Cir. 2014) (describing the bundle). New York courts have long afforded public performance rights to holders of common law copyrights in works such as plays, *Palmer v. De Witt*, 47 N.Y. 532, 535-36, 540-41 (1872); *Roberts v. Petrova*, 213 N.Y.S. 434, 434-37 (Sup. Ct. 1925); *French v. Maguire*, 55 How. Pr. 471, 472-73, 479-80, 1878 WL 11310 (N.Y. Sup. Ct. 1878) and films, *Brandon Films, Inc. v. Arjay Enter., Inc.*, 230 N.Y.S.2d 56, 57-58 (Sup. Ct. 1962). The Second Circuit concluded over three decades ago that New York would recognize a public performance right in compilations of film clips. *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1097-99, 1101-04 (2d Cir. 1982) (applying New York law).

Nonetheless, Sirius advances a number of arguments for why New York common law copyright in sound recordings does not include any public performance right.

Sirius principally argues that no such right exists because New York case law contains no discussion of public performance rights in sound recordings. But the exact same argument could have been made (and undoubtedly was made, and rejected) in *Naxos* – a case decided only in 2005,

17

more than a century after sound recordings were invented. The very fact that *Naxos* was decided in favor of the common law copyright holder, after more than a century of judicial silence, means that this court can infer nothing – certainly not that the common law copyright in sound recordings does not encompass all of the rights traditionally accorded to copyright holders in other works, including the right of public performance – from the fact that this is the first case to raise the issue.

Of course, the conspicuous lack of any jurisprudential history confirms that not paying royalties for public performances of sound recordings was an accepted fact of life in the broadcasting industry for the last century. So does certain testimony cited by Sirius from record industry executives, artists and others, who argued vociferously before Congress that it was unfair for them to operate in an environment in which they were paid nothing when their sound recordings were publicly performed. *See, e.g.*, *Digital Performance Rights: Hearing Before the House Judiciary Committee Subcommittee on Courts and Intellectual Property on H.R. 1506*, 104th Cong. (1995) (statement of Edward O. Fritts, President & CEO, Nat'l Ass'n of Broadcasters), 1995 WL 371107; H. Comm. On Patents, 74th Cong., Hearings on Revision of Copyright Laws 622 (Comm. Print. 1936) (statement of H.A. Huebner, representing Brunswick Record Corp. and Columbia Phonograph Co.); *see also* Sirius Summary Judgment Mem. at 9-12. That they were paid no royalties was a matter of statutory exemption under federal law; that they demanded no royalties under the common law when their product as ineligible for federal copyright protection is, in many ways, inexplicable.

But acquiescence by participants in the recording industry in a status quo where recording artists and producers were not paid royalties while songwriters were does not show that they lacked an enforceable right under the common law – only that they failed to act on it. The United States Copyright Office, in its most recent commentary on this subject, concluded, "While, as a factual

18

matter, a state may not have affirmatively acknowledged a public performance right in pre-1972 recordings as of the Office's 2011 report, the language in the report should not be read to suggest that a state could not properly interpret its law to recognize such a right." *Music Licensing Study: Second Request for Comments*, 79 Fed. Reg. 42,833-01, 42,834 n.3 (July 23, 2014).

The United States Supreme Court admonished recently against reading too much into a lack of precedent for a point:, stating (in another context), "It should be unsurprising that such a significant matter has been for so long judicially unresolved." *D.C. v. Heller*, 554 U.S. 570, 625 (2008). The Supreme Court, for example, failed to grapple with many fundamental constitutional questions for the first 150 years of the Constitution's existence. *Id.* at 625-26. I thus do not read too much into the fact that New York courts have never squarely addressed a particular feature of state copyright law in the context of sound recordings.

In fact, there is precedent for this kind of judicial silence in the copyright arena. Prior to 1976, choreography was deemed ineligible for any sort of copyright protection, under federal or common law. Courts declined to offer copyright protection to dance on the theory that choreographic works did not "tell" a story, and thus could not be considered copyright-eligible "dramas." *See, e.g.*, *Seltzer v. Sunbrock*, 22 F. Supp. 621, 628-29 (S.D. Cal. 1938); *Fuller v. Bemis*, 50 F. 926, 929 (S.D.N.Y. 1892). That changed with the 1976 amendments to the Copyright Act, which explicitly recognized "choreographic works" as copyright-eligible. *See* Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, 2544-45. Since then, an entire body of law has evolved concerning dance copyright – not all at once, or all as soon as the 1976 Act became effective, but over the ensuing decades.

So it is not surprising that sound recordings, like choreographic works, received little attention from courts before they became eligible for statutory copyright. It is likely that the issue

19

was just not on anyone's radar screen until Congress granted a public performance right in more recent sound recordings.

An arguably stronger argument can be made that years of judicial silence implies exactly the opposite of what Sirius contends – not that common law copyright in sound recordings carries no right of public performance, but rather that common law copyright in sound recordings comes with the entire bundle of rights that holders of copyright in other works enjoy. No New York case recognizing a common law copyright in sound recordings has so much as suggested that right was in some way circumscribed, or that the bundle of rights appurtenant to that copyright was less than the bundle of rights accorded to plays and musical compositions. The expansive nature of New York's common law protection for artistic works that do not enjoy federal statutory copyright protection was announced over fifty years ago, in *Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.*, supra – a case protecting property rights in sound recordings. There, the court said, "The law has . . . protected the creative element in intellectual productions—that is, the form or sequence of expression, the new combination of colors, sounds or words presented by the production . . . against appropriation by others." *Metro. Opera*, 101 N.Y.S.2d at 493.

Modern federal law supports the notion that an express carve-out is required in order to circumscribe the bundle of rights appurtenant to copyright. When Congress amended the Copyright Act in 1971 to protect copyrights in sound recordings, it announced quite explicitly that sound recordings would not carry any right to public performance. The relevant section of Title 17 limits copyright in sound recordings to the rights, "To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording." Sound Recordings Act, Pub. L. No. 92-140, 85 Stat. 391, 391 (1971). The 1971 Act further provided that "the exclusive right of the owner of a copyright in a

20

sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form," and that "this right does not extend to . . . reproductions made by transmitting organizations exclusively for their own use." *Id.*

This express carve-out for public performance strongly suggest that, absent such an explicit limitations, holder of sound recording copyrights would have enjoyed the entire bundle of rights traditionally granted to copyright holders – including the right to public performance, which has been part of the bundle of rights enjoyed by holders of federal copyrights in performable works since 1897 or earlier. Put otherwise, if public performance rights were not part of the normal bundle of rights in a copyright, Congress would not have needed to carve out an exception specifically for sound recordings. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 375 n.12 (2006) (same principle in the context of bankruptcy law).[3]

---

[3] The history of Congressional grants of public performance rights is convoluted. The 1831 Act, which first granted copyright protection to authors of musical compositions, did not provide a public performance right. *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436. When Congress added copyright protection for "dramatic composition[s]" in 1856, it expressly included a "sole right to . . . perform, or represent" the composition, without providing any comparable right for copyrights in other works. Act of Aug. 18, 1856, ch. 169, 11 Stat. 138, 139. That state of affairs continued through the general copyright law revisions of 1870 in which Congress expressly provided a "public[] perform[ance]" right for dramatic compositions but not for musical compositions. Act of July 8, 1870, ch. 230, § 86, 16 Stat. 198, 212. Finally, in 1897, Congress added a public performance right specifically for musical compositions. Act of Jan. 6, 1897, ch. 4, 29 Stat. 481, 481-82. When Congress revised the copyright law in 1909, it continued to provide the holders of copyrights in dramatic compositions and musical compositions with the exclusive right to "perform [their works] publicly." Act of Mar. 3, 1909, ch. 320, § 1, 35 Stat. 1075, 1075. Other types of works, however, did not enjoy that same privilege.

By the time Congress enacted copyright protection for sound recordings, public performance rights were firmly entrenched for musical compositions and dramatic compositions: the two kinds of works to which public performance rights could sensibly be provided. It was thus an accepted part of the background law that public performance rights would, absent a deliberate effort to exclude them, extend to sound recordings. That principle applies with even more force to common law copyright, which generally includes fewer limitations on exclusive rights than does federal statutory law. *See* Shyamkrishna Balganesh, *The Pragmatic Incrementalism of Common Law Intellectual Property*, 63 VAND. L. REV. 1543, 1563 (2010).

21

Sirius also raises several policy arguments against public performance rights in pre-1972 sound recordings.[4]

Sirius claims that affording public performance rights would not serve the underlying purposes of copyright law because pre-1972 recordings already exist and further rights cannot create incentives for the creation of new pre-1972 recordings.

But the same criticism could be leveled against the New York Courts of Appeals' decision in *Naxos*. There, in answer to a certified question from the Second Circuit, the New York Court of Appeals held that, "New York provides common-law copyright protection to sound recordings not covered by the federal Copyright Act, regardless of the public domain status in the country of origin." *Naxos*, 4 N.Y.3d at 563. The plaintiffs in *Naxos* owned several sound recordings made in the 1930s, which had fallen into the public domain in the United Kingdom where they were originally copyrighted. Allowing the *Naxos* plaintiffs to assert their common law right of reproduction could not possibly have created any incentive to produce new sound recordings – especially since all newly created sound recordings enjoy exclusive copyright protection under federal law. Yet the New York Court of Appeals held that those plaintiffs could proceed on their common law copyright infringement claims. From that holding, I conclude that New York does not protect common law copyrights only when that protection creates incentives for new similar works.

---

[4] Sirius frames these arguments with the general principle that federal courts should apply state common law as it currently stands – not as they think it should be. That is a correct statement of the role of federal courts. But I am not applying the law as I think it "should" be, but as I "predict how the New York Court of Appeals would resolve . . . question." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005). Unlike the Second Circuit, I do not have the option to certify even profoundly uncertain issues of state law to the Court of Appeals.

22

-22-

New York is hardly unique in this regard. Each time that Congress is asked to extend the term of copyright protections (a request not infrequently made), someone observes that allowing the children and grandchildren of creative people long dead to collect royalties does nothing to encourage creativity, and so cuts against both the traditional argument in favor of copyright and undermines the historic belief that, at some point, a Government-created monopoly on intellectual property should yield to an expanded public use. Congress has rejected that perfectly sensible argument time and time again. I see no reason to conclude that either statutory or common law copyright any longer focuses on fostering future creativity, as opposed to rewarding past creativity.

Sirius also claims that recognizing public performance rights in pre-1972 sound recordings would unjustly punish good faith investors who provided capital for Sirius.

Investors always assume the risk that whatever economic model they are working off will turn out not to be correct, so investor expectations are rarely "settled" enough to provide a justification for declining to apply the correct legal rule.

However, I question whether the investors would be truly surprised if Sirius were to have to pay royalties in order to perform pre-1972 sound recordings. Sirius, which broadcasts exclusively in non-analog form, must pay royalties under federal law in order to broadcast post-1972 sound recordings. All Flo and Eddie seeks here is the right to receive royalties under state law for the digital broadcasting of its pre-1972 recordings – hardly a shocking development in the world of digital broadcasting.

Indeed, as a matter of public policy there would seem to be good reason to harmonize New York's common law of copyright with its federal statutory counterpart, *see* 2 NIMMER ON COPYRIGHT § 8[C][2], and recognizing public performance rights in pre-1972 sound recordings would conform the two.

23

In 1995, Congress added a limited right for sound recording copyright holders to publicly perform their works "by means of a digital audio transmission." 17 U.S.C. § 106. In creating that limited right, Congress carefully balanced the interests of all affected parties. As Senator Hatch explained, the bill establishing a public performance right was "forward looking. It largely leaves in place mature businesses that have grown up under the old copyright regime [i.e., analog broadcasting]. It seeks to ensure that creators of sound recordings will have the rights they have been denied until now as the digital age dawns." 141 Cong. Rec. 22,775, 22,779 (1995). By establishing a "new digital performance right [that] applies to digital audio transmission . . . [but] not [] to traditional broadcasts and most other free transmissions" Congress "attempted to balance the competing interests of the various copyright owners as well as users." *Id*; *see* H.R. Rep. No. 104-274, at 13-15 (1995); S. Rep. No. 104-128, at 13-17 (1995); *see generally* Kimberly L. Craft, *The Webcasting Music Revolution Is Ready to Begin, As Soon As We Figure Out the Copyright Law: The Story of the Music Industry at War with Itself*, 24 HASTINGS COMM. & ENT. L.J. 1, 9-13 (2001) (discussing the legislative history of the 1995 Act).

Sirius would of course respond that any public performance right that the New York Court of Appeals might recognize would be broader than the right legislated by Congress, encompassing analog broadcasting, the "mature" (some would say dying) industry that Congress exempted from the payment of royalties for public performance. And Sirius quite rightly notes that the right Congress has created for post-1972 works is part of a carefully crafted scheme that operates nationwide, whereas common law copyrights are the province of the several states – raising the specter of administrative difficulties in the imposition and collection of royalties, which would ultimately increase the costs consumers pay to hear broadcasts, and possibly make broadcasts of pre-1972 recordings altogether unavailable.

24

Sirius may well be correct that a legislative solution would be best. But the common law, while a creature of the courts, exists to protect the property rights of the citizenry. And courts are hardly powerless to craft the sort of exceptions and limitations Congress has created, or to create a mechanism for administering royalties. Sirius forgets that it was this court, not Congress, that, back in 1950 fashioned a consent decree that set up what became the most successful mandatory licensing and royalty scheme in the world – a system still administered by a judge of this court, which functions as a rate court for the major licensing houses like ASCAP and BMI. *See United States v. Am. Soc'y of Composers, Authors and Publishers*, No. CIV.A. 42-245, 1950 WL 42273 (S.D.N.Y. Mar. 14, 1950), *amended* (July 17, 1950); *see also United States v. Broad. Music, Inc.,* No. 64 CIV. 3787, 1994 WL 901652, (S.D.N.Y. Nov. 18, 1994) (modifying 1966 BMI consent decree). New York courts are capable of fashioning appropriate relief – and even of recognizing only such public performance rights in pre-1972 sound recordings as conform to rights statutorily conferred on holders of statutory copyright in post-1972 recordings.

In short, general principles of common law copyright dictate that public performance rights in pre-1972 sound recordings do exist. New York has always protected public performance rights in works other than sound recordings that enjoy the protection of common law copyright. Sirius suggests no reason why New York – a state traditionally protective of performers and performance rights – would treat sound recordings differently.

25

## V. Sirius Infringed Flo and Eddie's Common Law Copyright and Engaged in Unfair Competition

### A. Common-Law Copyright Infringement

#### 1. Sirius Reproduced Flo and Eddie's Copyrighted Recordings Without Authorization

"A copyright infringement cause of action in New York consists of two elements: (1) the existence of a valid copyright; and (2) unauthorized reproduction of the work protected by the copyright." *Naxos*, 4 N.Y.3d at 563.

As explained above, Flo and Eddie holds a valid copyright in the Turtles recordings. The record clearly shows that Sirius reproduced those recordings without authorization. In particular, Sirius reproduced Turtles recordings for its three main databases and associated backups, as well as for the smaller on-site databases, including the database it transferred to Omnifone. Sirius also made several temporary but complete copies of Turtles recordings: on its play-out server each time a Turtles song was performed, in each of the five-hour caches, and in the half-hour buffer available on some in-vehicle satellite radios.

To be sure, some of the alleged copies may not qualify as infringing reproductions. Buffering, for example, does not constitute infringement under federal law. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127-30 (2d Cir. 2008). The tips-and-tails partial copies may be too fragmentary or ephemeral to constitute infringement. But Sirius does not seriously dispute that many of the copies it made of Turtles recordings – in particular the permanent copies – amount to reproductions as a matter of law.

In reproducing Turtles recordings, Sirius acted without authorization. As noted above, Sirius has not obtained licenses for using pre-1972 recordings, either to store those recordings in its databases or to broadcast them. Nor has Sirius obtained licenses or paid royalties for transferring those recordings to third parties.

26

Sirius argues instead that it is not liable for infringement because it did not *distribute* the Turtles recordings. Sirius supports that argument with language from *Naxos*, "Copyright infringement is distinguishable from unfair competition, which in addition to unauthorized copying and distribution requires competition in the marketplace or similar actions designed for commercial benefit." 4 N.Y.3d at 563. This language, according to Sirius, establishes that "distribution" of a copyrighted work is an element of common law copyright infringement. A distribution requirement would be consistent with Sirius's assertion that New York does not provide any exclusive right to publicly perform sound recordings.

But as I explained above, New York law does provide copyright holders with just that exclusive performance right for sound recordings. To the extent that distribution is an element of common law copyright infringement, publicly performing sound recordings is an act of distribution. Otherwise, Sirius cannot explain how New York courts could have recognized infringement claims alleging that defendants publicly performed copyrighted works without authorization. *See, e.g.*, *Brandon Films*, 230 N.Y.S.2d at 57-58; *French*, 55 How. Pr. at 472-73, 479-80, 1878 WL 11310.

In addition to *Naxos*, Sirius cites *Hemingway's Estate v. Random House, Inc.*, 279 N.Y.S.2d 51 (Sup. Ct.) *aff'd sub nom.* 285 N.Y.S.2d 568 (App. Div. 1967) *aff'd sub nom.* 23 N.Y.S.2d 341 (1968), in which the New York Supreme Court held that a publisher did not infringe the plaintiff's copyright by including gallery proofs in a few copies of a book before the book was finally published. *Id.* at 54-56. But public performance rights were not at issue in *Hemingway's Estate*, and the Supreme Court never suggested in its opinion that public performance could not be a form of distribution. Rather, on the facts of the case, that court found that, "No use of any kind was made of the original galley proofs." *Id.* at 55.

27

One might argue that Flo and Eddie divested itself of its copyright in the Turtles sound recordings by "publishing" those recordings. *See Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co.*, 155 N.Y. 241, 247 (1898). Publication is a term of art in the common law of copyright and it does not encompass every dissemination of a copyrighted work, even if the work reaches thousands of people. *Jewelers' Mercantile Agency*, 155 N.Y. at 247-48; *Hemingway's Estate*, 279 N.Y.S.2d at 55.

But there is a good reason why Sirius did not make this argument. In the context of sound recordings, "it has been the law in [New York] for over 50 years that, in the absence of federal statutory protection, the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection." *Naxos*, 4 N.Y.3d at 560; *see also Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 493-95 (Sup. Ct. 1950) *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951). Public sale is exactly what Flo and Eddie have done with the Turtles sound recordings. Under *Naxos*, that does not constitute publication. Flo and Eddie therefore retains its common law copyright in those recordings.

### 2. Sirius's Creation of Multiple Complete Copies of Flo and Eddie's Sound Recordings Cannot Be Considered Not Fair Use

Although the case law is sparse, it appears that New York recognizes fair use as a defense to copyright infringement. *See Fendler v. Morosco*, 253 N.Y. 281, 291 (1930); *EMI Records Ltd. v. Premise Media Corp., L.P.*, 2008 N.Y. Misc. LEXIS 7485, at *9-11 (N.Y. Sup. Ct. Aug. 8, 2008); *Hemingway's Estate*, 279 N.Y.S.2d at 57. New York courts have not, however, articulated the scope of New York's fair use doctrine. I will assume, as do the parties, that New York's fair use defense operates similarly to the federal defense, which is codified in 17 U.S.C. § 107. *See EMI Records*, 2008 N.Y. Misc. LEXIS 7485, at *16-18.

28

Under federal law, courts "determin[e] whether the use made of a work in any particular case is a fair use" by considering, among other factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

On all four factors, Sirius's creation of the unauthorized copies fails to qualify as "fair use."

In considering the first factor – the "purpose and character of the use," courts must ask "whether the new work merely supersedes the objects of the original creation or instead adds something new, with a further purpose or different character . . . , in other words, whether and to what extent the new work is transformative. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal citations, quotation marks, and alterations omitted); *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

Sirius is a for-profit entity using Flo and Eddie's recordings for commercial purposes. Moreover, Sirius's use is not transformative. Sirius does not add anything new or change the Turtles recordings by copying and performing them. Publicly performing a recording adds no "new expression, meaning, or message," to the recording. *Campbell*, 510 U.S. at 579. Sirius lets subscribers hear Turtles recordings through a different medium, but that does not make its use "transformative." insofar as the recording is concerned – however "transformative" satellite radio may be in the context of broadcasting.

The cases cited by Sirius do establish that a use may be transformative even when it requires completely copying a copyrighted work. But the uses in those cases are far different than what Sirius does. Courts, for example, have upheld as fair use copying images that then appear as "thumbnail" results in response to an internet search. *See, e.g., Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2003). But a thumbnail is a lower-quality image that does not serve the

29

purpose of the original – to view and appreciate. *Id.* Courts have also upheld search engines' copying original books so that users can search the books and find out where certain phrases appear. *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2013). That too is a different use from the original book, which is meant to be read, not searched by keyword. *Id.* What one wants to do with a sound recording is to hear it, and that can be done just by listening to Sirius.

The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. In particular, "creative expression for public dissemination falls within the core of the copyright's protective purposes." *Campbell*, 510 U.S. at 586; *see Authors Guild, Inc.*, 755 F.3d at 96. Even Sirius recognizes that the Turtles works are "creative." Sirius claims that the second factor does not favor Flo and Eddie because the Turtles' sound recordings have been widely disseminated for decades. This is a non-sequitur; widespread distribution does nothing to alter the creative character of a copyrighted work. The cases Sirius cites does not hold to the contrary.

The third fair use factor requires courts to consider "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. "The third factor asks whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *Authors Guild, Inc.*, 755 F.3d at 96. Further, "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. Sirius has copied and performed several Turtles recordings in their entirety. As explained above, Sirius's use is non-transformative and commercial. It has, in the words of the Second Circuit, no "valid purpose[] asserted under the

30

first factor." *Authors Guild, Inc.*, 755 F.3d at 96. Thus, the third factor does not favor even minimal copying by Sirius.

Sirius leans heavily on the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. The Second Circuit has explained that "the relevant market effect with which we are concerned is the market for plaintiffs' expression, and thus it is the effect of defendants' use of that expression on plaintiffs' market that matters." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004) (internal quotation marks and citation omitted). As a matter of "common sense[] when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591. (internal citations, quotation marks, and alterations omitted).

Sirius makes non-transformative use of Flo and Eddie's recordings and does so for commercial gain. It is, therefore, "common sense[]," *id.*, that Flo and Eddie would suffer market harm when Sirius takes its property and exploits it, unchanged and for a profit. That exploitation "supersedes the objects of the original." *Id.*

Sirius responds to this common-sense conclusion with two points: (1) Flo and Eddie points to no actual evidence or lost sales or licensing fees caused by Sirius's operations; and (2) there is no existing market for licensing pre-1972 sound recordings for public performance. Those responses are unpersuasive.

31

First, discovery on damages has not yet been conducted. The evidence might ultimately show that Flo and Eddie has lost fewer sales than one might expect as a result of Sirius' unauthorized copying and public performances of their recordings. But it is beyond cavil that Flo and Eddie has hereto been unable to obtain *any* money from the broadcasting of their sound recordings; if its common law copyright had been recognized, plaintiff could and undoubtedly would have charged Sirius something to broadcast them.

Second, Flo and Eddie describes the fourth fair use factor too narrowly. The fourth factor allows courts to consider not only presently existing markets, but also "potential" or "reasonable, [] likely to be developed markets." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir.1994)). A market for licensing post-1972 sound recordings already exists. It has to, by law. *See* 17 U.S.C. §§ 112, 114. It is not difficult to conceive that a similar market for pre-1972 recordings would develop if owners of those recordings asserted their rights.

The fourth factor also requires courts to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. Widespread public performance of sound recordings – that is, the conduct in which Sirius is engaged – could easily satisfy public demand to hear those recordings. That, again as a matter of common sense, could result in a substantial impact on Flo and Eddie's ability to sell and license Turtles recordings. If a subscriber can easily hear recordings performed by Sirius, why buy a record or download the recording from iTunes? If a potential licensee wants to perform Turtles recordings, why pay to do so, when Sirius performs them for free?

32

### 3. Sirius Engaged in Unfair Competition

Unfair competition is an "adaptable and capacious" tort that "has been broadly described as encompassing 'any form of commercial immorality.'" *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (quoting *Metro. Opera Ass'n*, 101 N.Y.S.2d at 492). More precisely, New York courts "have long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476-77 (2007). Palming off – "that is, the sale of the goods of one manufacturer as those of another," *id.* – is not at issue in this litigation. "An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Exp. Co.*, 672 F.2d at 1105; *see ITC Ltd.*, 9 N.Y.3d at 477-79.

Flo and Eddie's claim involves misappropriation. In particular, it argues that Sirius has taken and used the Turtles recordings – its property – to compete against it. Sirius does not truly dispute that it has "tak[en] and use[d]" Flo and Eddie's recordings. Instead Sirius raises two objections to Flo and Eddie's unfair competition claim.

First, Sirius claims that under *Naxos*, unfair competition requires "distribution" of property. *See* 4 N.Y.3d at 563. That is a strained reading of *Naxos*, which described a particular unfair competition claim grounded in physically pirating and selling records. No other opinion of which I am aware has described "distribution" as a requirement of the otherwise highly flexible and adaptable unfair competition tort. In any event, as I explained above, public performance is a form of distribution.

Second, Sirius argues that Flo and Eddie has not suffered any competitive injury. It is now well established that "the existence of actual competition between the parties is no longer a prerequisite" to sustaining an unfair competition claim. *Metro. Opera Ass'n*, 101 N.Y.S.2d at 491-92 (citing cases); *see ITC Ltd.*, 9 N.Y.3d at 478. Some "competitive injury," however, is still

33

required. *Yantha v. Omni Childhood Ctr., Inc.*, No. 13-CV-1948, 2013 WL 5327516, at \*7 (E.D.N.Y. Sept. 20, 2013). A plaintiff must therefore show, "a direct financial loss, lost dealings, or lost profits resulting from the anticompetitive acts at issue or, at the very least, that defendant diverted plaintiff's customers and business to defendant." *Id.* (internal citations, quotation marks, and alterations omitted).

Flo and Eddie has satisfied the competitive injury requirement. As I explained when discussing fair use, it is a matter of economic common sense that Sirius harms Flo and Eddie's sales and potential licensing fees (even if the latter market is not yet extant) by publicly performing Turtles sound recordings. Evidence of the extent of that loss has not yet been presented because discovery has not yet been conducted on damages.

## VI. Flo and Eddie's Assertion of its Common Law Copyright Is Not Barred by the Dormant Commerce Clause

Finally, Sirius argues that Flo and Eddie's claims are barred by the Dormant Commerce Clause. Sirius is wrong.

The Constitution grants to Congress "Power . . . To regulate Commerce . . . among the several States . . . ." U.S. CONST. art. I, § 8. Although the Commerce Clause is written as an affirmative grant of power to Congress, the Supreme Court has held that it includes a negative or "dormant" implication that states may not interfere with interstate commerce. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326 n.1 (1989).

States may run afoul of the Dormant Commerce Clause's implied limits on their power in several ways: by discriminating against out-of-state goods, *see, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 454-57 (1992), by imposing generally applicable regulations that have the effect of excessively burdening interstate commerce, *see, e.g.*, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142-46 (1970), or by directly regulating commerce in other states, *see, e.g.*, *Healy*, 491 U.S. at

34

335-40. Sirius argues that the last prohibition – directly regulating commerce in other states – applies here.

Flo and Eddie argues that the Court need not reach the constitutional question because Congress has authorized New York to regulate pre-1972 sound recordings.

It is hornbook law that "Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). "But because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, th[e Supreme] Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.'" *Id.* at 138-39 (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)); *see Wyoming v. Oklahoma*, 502 U.S. at 458 (requiring an "unambiguous" congressional directive).

Flo and Eddie claims to find unambiguous Congressional authorization for New York's common law copyright scheme to be exempted from the implied limitations of the Commerce Clause in 17 U.S.C. § 301(c), which reads in full:

> With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067. The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on and after February 15, 2067. Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067.

In one of the two companion cases between Flo and Eddie and Sirius, my colleague in the District Court for the Central District of California found that § 301(c) unambiguously authorizes Flo and Eddie's companion California-law action. In a footnote, it dismissed with almost no discussion a Dormant Commerce Clause challenge similar to the one Sirius raises here, stating that "Because Congress specifically authorized protection of pre–1972 sound recording rights by the

35

states in 17 U.S.C. § 301(c), the California statute protecting those rights is not subject to the Commerce Clause." *Flo & Eddie Inc. v. Sirius XM Radio Inc.*, No. CV 13-5693, 2014 WL 4725382, at \*9 n.1 (C.D. Cal. Sept. 22, 2014).

However, I do not find the California Court's analysis persuasive, as it does not explain why the cited statute qualifies as a Commerce Clause exemption. And Flo and Eddie cites no legislative history or case law indicating that Congress intended to eliminate Dormant Commerce Clause scrutiny for state common law copyright. Instead, Flo and Eddie emphasizes the word "any," which it argues is an indication that Congress intended to permit "all" state statutes regulating copyright.

I do not read the cited section as Flo and Eddie does. I note that § 301(c) is contained in the section of the federal copyright law that addresses the law's preemptive scope. Thus, the language cited by Flo and Eddie could plausibly be interpreted, not to allow states to impose otherwise unconstitutional burdens on interstate commerce, but only to limit the scope of federal copyright law – by excluding, for a period of time, otherwise preempted state laws from the preemptive reach of 17 U.S.C. § 301(a). Under this interpretation, although § 301(c) broadly reaches "any" state right or remedy, it shields state regulation only from statutory preemption, not from Commerce Clause scrutiny.

The Supreme Court has construed an analogous statute in this very manner when analyzing a Dormant Commerce Clause challenge. In *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982), the Court decided whether Section 201 of the Federal Power Act was "an affirmative grant of power to the states to burden interstate commerce." *Id.* at 341. Subsection 201(b) provided that no provisions of the subchapter of which it was a part – including the sweeping preemption provisions of § 201(a) – "shall . . . deprive a State or State commission of its lawful authority now

36

-36-

exercised over the exportation of hydroelectric energy which is transmitted across a State line."
*Id.* (quoting 16 U.S.C. § 824(b)).

The Court held that § 201(b) did "[n]othing . . . to alter the limits of state power otherwise
imposed by the Commerce Clause," but "simply save[d] from pre-emption under Part II of the
Federal Power Act such state authority as was otherwise lawful." *Id.* (internal citations and
quotation marks omitted). So it is with 17 U.S.C. § 301(c). Like the statute at issue in *New England
Power*, § 301(c) is framed as a limitation on preemption, not a relaxation of Commerce Clause
limitations. That interpretation is even more persuasive here because, unlike in the statute analyzed
in *New England Power*, § 301(c) makes no explicit reference to any sort of interstate commerce.

Even if the matter is not free from doubt, at the very least it is reasonable to interpret §
301(c) as a provision about federal statutory preemption, and not as an authorization for states to
interfere with interstate commerce. That being so, § 301(c) does not "unambiguous[ly]," *Wyoming
v. Oklahoma*, 502 U.S. at 458, or "unmistakably," *S.-Cent. Timber*, 467 U.S. at 91, permit state
interference with interstate commerce in connection with pre-1972 sound recordings.

Therefore, and applying the reasoning of *New England Power*, I decline to adopt Flo and
Eddie's interpretation of § 301(c).

However, Sirius's Dormant Commerce Clause challenge fails for a different reason: New
York does not "regulate" anything by recognizing common law copyright. The issue is nothing
more than a red herring.

The Clause itself "withholds from the states[, ]the power to regulate Commerce among the
several States." *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 510 (2d Cir. 1995) (original
alterations omitted). Thus, "the strictures of the dormant Commerce Clause are not activated unless
a state action may be characterized as a 'regulation.'" *Id*; *United Haulers Ass'n, Inc. v. Oneida-*

37

*Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 254 (2d Cir. 2001) *aff'd*, 550 U.S. 330 (2007); *Metro. Washington Chapter v. D.C.*, No. CV 12-853, --- F. Supp. 2d ----, 2014 WL 3400569, at *16 (D.D.C. July 14, 2014).

Typically, courts have applied that principle in the context of the market participant exception, holding that states do not "regulate" commerce by actively participating in commercial markets. *See, e.g.*, *SSC Corp.*, 66 F.3d at 510.

But it is not only market participation that falls outside Dormant Commerce Clause scrutiny. In *Sherlock v. Alling*, 93 U.S. (3 Otto) 99 (1876), the Supreme Court considered whether an Indiana statute establishing liability for wrongful death, "if applied to cases of marine torts, would constitute a new burden upon commerce." *Id.* at 101-02 The Court affirmed the general principle that "States cannot by legislation place burdens upon commerce with foreign nations or among the several States." *Id.* at 102. But it noted that in every case where it had found a Dormant Commerce Clause violation, "the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between particular places was required to be conducted." *Id.* By contrast, the Indiana statute at issue "only declare[d] a general principle respecting the liability of all persons within the jurisdiction of the State for torts." *Id.* at 103.

The Court explained that "General legislation . . . prescribing the liabilities or duties of citizens of a State . . . is not open to any valid objection because it may affect persons engaged in foreign or inter-State commerce." *Id.* Otherwise, "Objection might with equal propriety be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates

38

-38-

of persons engaged in such commerce." *Id.* Since *Sherlock* was decided, courts have rejected Dormant Commerce Clause challenges for the reasons it cites. *See, e.g.*, *Atl. Coast Line R. Co. v. Mazursky*, 216 U.S. 122, 132-34 (1910) (challenge to a law attaching liability to common carriers who failed to settle loss claims within forty days); *Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 46 (D. Mass. 2002) (challenge to tort action attaching liability to airline's failure to carry a defibrillator); *D.C. v. Beretta, U.S.A.*, Corp., 872 A.2d 633, 656-57 (D.C. 2005) (challenge to statute attaching strict liability to actions by firearms manufacturers); *West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 214-15 (Iowa 1972) (challenge to negligence action asserting failure-to-warn liability) (collecting cases).

What Sirius objects to is a "general principle respecting the liability of all persons within the jurisdiction of" New York. *Sherlock*, 93 U.S. (3 Otto) at 103. In particular, Sirius objects to property law principles that establish liability for infringing another party's copyright. But that property law principle is not a state-imposed regulation – even when applied to public performances by a national broadcaster. Sirius has not cited, and the Court has not found any cases holding that a state's general property law and associated liability principles could, in and of themselves, violate the Dormant Commerce Clause.

Holding Sirius liable might affect interstate commerce – just as a finding of liability did in *Sherlock. Id.* at 103. But concluding that Sirius is liable under New York property law principles would not amount to a "regulation" of interstate commerce by New York. It would, therefore, not give rise to a Dormant Commerce Clause claim.

Sirius is correct that this holding is unprecedented (aside from the companion California case, which reached the same result), and will have significant economic consequences. Radio broadcasters – terrestrial and satellite – have adapted to an environment in which they do not pay

39

royalties for broadcasting pre-1972 sound recordings. Flo and Eddie's suit threatens to upset those settled expectations. Other broadcasters, including those who publicly perform media other than sound recordings, will undoubtedly be sued in follow-on actions, exposing them to significant liability. And if different states adopt varying regulatory schemes for pre-1972 sound recordings, or if holders of common law copyrights insist on licensing performance rights on a state-by-state basis (admittedly, an unlikely result, since such behavior could well cause broadcaster to lose interest in playing their recordings) it could upend the analog and digital broadcasting industries.

But in the end, all this case presents me with is a suit between private parties seeking to vindicate private property rights – not a challenge to state regulation. That lawsuit can and will be resolved on its merits. The broader policy problems are not for me to consider. They are the province of Congress, the New York Legislature, and perhaps the New York Court of Appeals.

## CONCLUSION

For the foregoing reasons, Sirius's motion for summary judgment is **DENIED**. The Clerk of the Court is directed to remove Docket # 46 from the Court's list of pending motions. Sirius is **ORDERED** to advise the Court by Friday, December 5 of any remaining disputes of material fact that would require a trial. Otherwise, the Court will enter summary judgment in favor of Flo and Eddie as to liability and proceed to an inquest on damages.

Dated: November 14, 2014

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

FLO & EDDIE, INC.

      Plaintiff,

      -against-

SIRIUS XM RADIO, INC., and DOES 1-10,

      Defendants.

_____x

No. 13 Civ. 5784 (CM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _____

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION

McMahon, J.:

Defendant Sirius XM Radio, Inc. ("Sirius") has moved for reconsideration of the Court's

November 14, 2014 Memorandum Decision and Order Denying Defendant's Motion for Summary

Judgment ("the Order"), Docket #88, and in the alternative, for the Court to certify the Order for

interlocutory appeal. For the reasons stated below, Sirius's motion for reconsideration is **DENIED.**

Decision on the alternative motion for certification of an interlocutory appeal pursuant to

28 U.S.C. §1292(b) is deferred pending resolution of the outstanding order to show cause why a

summary judgment as to liability should not be awarded to Plaintiff.

The reader is presumed to be familiar with the facts of this case and with the Court's prior

decision.

### DISCUSSION

### I.    Standard

To prevail on a motion for reconsideration, the movant must demonstrate "an intervening

change of controlling law, the availability of new evidence, or the need to correct a clear error or

prevent manifest injustice." *See Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.

1

1983). The decision to grant or deny the motion for reconsideration is within the sound discretion of the district court, especially when there has been no appellate review of the prior decision. *Mina Invest. Holdings, Ltd. v. Lefkowitz*, 184 F.R.D. 245, 250 (S.D.N.Y. 1999).

The Court's review "is narrow and applies only to already-considered issues; new arguments and issues are not to be considered." *See Morales v. Quintiles Transnat'l Corp.*, 25 F. Supp. 2d 369, 372 (S.D.N.Y. 1998). A motion for reconsideration "is not a substitute for appeal and may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision." *See id.* (internal citations and quotation marks omitted).

## II.     Sirius's Motion for Reconsideration is Denied

### A.     *Whiteman* Does Not Alter The Court's Analysis of New York Common Law

Sirius (represented by newly-retained counsel) predicates its motion on the Court's admitted failure to consider in its decision a case not briefed, either by it or by Flo & Eddie, on the original motion: *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940). Sirius's new lawyers from O'Melveny & Myers assert that *Whiteman* is the very case that this Court stated did not exist: a case squarely holding that New York does not recognize any right of public performance in sound recordings that are protected by common law copyright. Obviously *Whiteman* is a very old case, and does not represent any "intervening change of controlling law," so the argument must be that the Court's failure to apply *Whiteman* constitutes "clear error."

The only clear error in this case is O'Melveny's. Sirius's former counsel had two perfectly good reasons not to argue the lack of any public performance right on the basis of Whiteman: (1) *Whiteman* does not hold that New York does not recognize a public performance right as part of the common law copyright in sound recordings; and (2) its actual holding – which is that the sale

2

-42-

of sound recordings to the public constituted "publication," which divested a creation of any common law copyright whatsoever – is no longer good law, and has not been for 60 years.

Paul Whiteman was a legendary orchestra conductor; in 1924, at Aeolian Hall, he famously conducted the first performance of George Gershwin's *Rhapsody in Blue*. Whiteman and his orchestra made a number of sound recordings on the RCA label, which were sold to the consuming public. The recordings bore a legend "Not Licensed for Radio Broadcast," or something similar. Nonetheless, W.B.O. Broadcasting went to a record store, purchased copies of the records and broadcast them over the radio. RCA Manufacturing sued to prevent W.B.O. from broadcasting certain sound recordings owned by RCA, under theories of common law copyright and unfair competition. *Id.* at 87.

The Second Circuit, in an opinion written by Judge Learned Hand, described the question raised by the case as whether RCA "*had any musical property at common-law* in the records which radio broadcasting invaded." *Id.* at 87. (emphasis added). The Court of Appeals held that RCA did not have any common law rights, of any sort, because the sale of the recordings to the public constituted "publication" of the recordings, which divested them of common law copyright protection altogether. Since sound recordings were ineligible for federal statutory copyright protection prior to 1972 (that is why we have this lawsuit), the effect of Judge Hand's ruling was to deny any sort of copyright protection to the creators of sound recording performances that were sold in the commercial marketplace.

Sirius argues that *Whiteman* rejected RCA's claims because New York law did not afford public performance rights to holders of common law copyrights in sound recordings.

I disagree. So does every other court and authority that has considered the issue.

3

-43-

The exact *holding* of *Whiteman* was this: "[W]e think that the 'common-law property' in

these performances ended with the sale of the records and that the restriction [the words on the

record jacket] did not save it." *Id.* All of the reasoning in *Whiteman* addressed that issue – whether

RCA had "published" its sound recordings by selling them to the public, thereby losing all of its

common law rights under then-applicable law. The Second Circuit did not decide what those rights

might have been, let alone specifically address whether those lost rights included an exclusive right

to publicly perform the sound recordings. One looks in vain in *Whiteman* for the statement, "New

York's common law copyright protection for sound recordings does not encompass any sort of

public performance right" – or words to that effect.

Sirius points to two sentences from *Whiteman* that it views as declaring public performance

rights to be unavailable for holders of common law copyrights in sound recordings.

Copyright in any form, whether statutory or at common-law, is a monopoly; it
consists only in the power to prevent others from reproducing the copyrighted work.
W.B.O. Broadcasting Corporation has never invaded any such right of Whiteman;
they have never copied his performances at all; they have merely used those copies
which he and the RCA Manufacturing Company, Inc.; made and distributed.
*Whiteman*, 114 F.2d at 88.

Sirius argues that Judge Hand – a famously precise and articulate writer – was actually saying in

these sentences that New York common law copyright in sound recordings does not come with a

public performance right attached.

Even read out of context, it would be a stretch to conclude that Sirius's strained

interpretation of Hand's decision is correct. But read in the context of the *Whiteman* decision as a

whole (including the holding that this Court quotes above), it is perfectly clear that these sentences

simply restate, in a different way, what the case actually held: once RCA offered copies of the

recordings for sale (i.e., "published" them), any common law copyright was lost and the purchaser

could "use[]" the copies that it purchased in any way it chose – including by playing them over the

4

radio. The reason W.B.O. "merely used" the sound recordings and "never invaded" RCA's rights, was because those rights (whatever they were) had vanished when RCA sold copies of the sound recordings.

Judge Hand's reasoning also gives the lie to Sirius' contorted reading of his decision. He observed, for example, that if a composer published a musical composition by printing copies of sheet music and selling them to the public,[1] he would have no right to limit how the purchaser used those copies of the music. Similarly, Judge Hand described how selling a book was an act of publication that destroyed common law copyrights. Judge Hand understood that both musical compositions and books were eligible for statutory copyright, whereas sound recordings were not. Nonetheless, he saw "no reason why the same acts that unconditionally dedicate the common-law copyright in works copyrightable under the act, should not do the same in the case of works not copyrightable" under federal law. *Id.*

Nothing in the justification offered for his decision so much as suggested that the Circuit was pronouncing that the bundle of rights appurtenant to common law copyright in sound recordings did not include a public performance right. Indeed, had Whiteman been predicated on the absence of a public performance right in sound recordings, the entire discussion of whether RCA's common law rights were divested by publication would have been superfluous; RCA could not possibly have "lost" via publication a right that never existed in the first place! That the Second Circuit felt the need to reach the publication issue actually suggests that it assumed the existence of a public performance right in the context of common law copyright.

---

[1] For this analogy to work, the copies sold would have lacked the familiar © legend; publication with the © divested common law copyright but preserved federal copyright (indeed, laid claim to federal statutory copyright) under the 1909 Copyright Act, which was in effect at the time Hand wrote *Whiteman*. That law was superseded in 1976.

5

Judge Hand also rejected RCA's suggestion that W.B.O.'s broadcasting of its recordings constituted unfair competition, again on the ground that the loss of rights associated with publication ended any unfairness. As he put it, if RCA "cannot bring themselves within the law of common-law copyright, there is nothing to justify *a priori* any continuance of their control over the activities of the public to which they have seen fit to dedicate the larger part of their contribution" through the theory of unfair competition. *Id.* at 90.

I am hardly the only jurist or scholar who reads *Whiteman* in this way. All the courts and secondary sources we have located interpret *Whiteman* as a case about publication, not about whether public performance is part of the bundle of rights conferred by common law copyright. *See, e.g.*, *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955) (*Whiteman* "stated that the common law property in the performances of musical artists which had been recorded ended with the sale of the records and that thereafter anyone might copy them and use them as he pleased."); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 554 (2005) (*Whiteman* "concluded that the sale of a record to the public is a general publication that ends common-law copyright protection."); Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current* Law, 1979 U. ILL. L. F. 337, 347 ("*Whiteman* stands for the principle that the sale of a record divests the production company or the performing artists of their rights, if any, to control its use."); Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 GEO. WASH. L. REV. 152, 155 (1974) ("Judge Learned Hand . . . ruled that any common law property of the record producer in the recorded performances ended with the record's sale, thereby making the restrictive legend on the label legally ineffective.").

6

-46-

Even if *Whiteman* stood for the proposition that Sirius asserts – and it does not – Sirius's motion for reconsideration fails for a second reason: *Whiteman* has been overruled, so it stands for nothing at all.

The Second Circuit in *Whiteman* was doing exactly what I am doing in this case: predicting how the New York courts, which are the ultimate authority on New York common law, would rule on an unsettled question of New York common law.[2] After *Whiteman*, New York courts spoke to the question, and they did not reach the same conclusion as Judge Hand. *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (Sup. Ct. 1950) aff'd, 107 N.Y.S.2d 795 (App. Div. 1951). Recognizing this development, the Second Circuit concluded, in 1955, that: "the quoted statement from the RCA case is *not the law of the State of New York.*" *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955) (citing *Whiteman*, 114 F.2d at 88-89) (emphasis added). The "quoted statement" to which reference is made spans *Whiteman*'s entire discussion of the effect of publication on the existence of a copyright. So while Sirius tries to avoid the impact of *Whiteman's* reversal by arguing that the Second Circuit overruled only a single statement about unlimited copying of published works from the earlier opinion, that is plainly not the case. It overturned Judge Hand's ruling that the sale of sound recordings constituted publication – as this Court recognized in the Order, when it said "it has been the law in New York for over 50 years that . . . the public sale of a sound recording . . . does not constitute a publication sufficient to divest the owner of common-law copyright protection." Order at 28 (internal citations, quotation marks, and alterations omitted)

---

[2] The certification of questions to the New York Court of Appeals was almost unheard of in 1940, and that was true even when this Court was engaged in the practice of law; but it is now quite routinely done to settle issues like the one raised by this case. I rather expect that this case will be certified to the New York Court of Appeals once it goes up on appeal.

7

In short, *Whiteman* affords no basis to reconsider my earlier Order; if anything, it reinforces the decision reached by this Court.[3]

## B. The Court Properly Rejected Sirius's Dormant Commerce Clause Challenge

Sirius also attempts to reargue its Dormant Commerce Clause challenge. Its arguments are entirely without merit.

Sirius does not dispute that the reach of the Dormant Commerce Clause is only to state actions properly characterized as "regulations." *See* Order at 37-38. Instead of explaining how liability for common law copyright infringement constitutes a regulation, Sirius dodges and misconstrues the issues.

I did not hold, and I do not hold now, that New York common law copyright is exempt from Dormant Commerce Clause scrutiny because it is neutral and generally applicable. Nor did I hold that the Commerce Clause does not apply because New York law establishes Sirius's liability in some form. Rather, I said that the New York common law copyright – specifically a judicial decision protecting Flo and Eddie's common law copyright – is not a "regulation" subject to Commerce Clause scrutiny.

Sirius argues that state common law and state law as interpreted by courts can violate the Dormant Commerce Clause. Sirius also argues that state regulation may run afoul of the Dormant Commerce Clause entirely because of the "practical effects" on interstate commerce. That is all true, but irrelevant. The question is whether the law at issue – common law copyright – constitutes "regulation." In the one case Sirius does cite applying the Commerce Clause to a judicial finding

---

[3] Sirius does add some new spin on its arguments, claiming that public performance rights for sound recordings are unique in that they affect multiple competing stakeholders. Recordings are not really unique – musical composition copyrights raise the same issues. More importantly, those stakeholders all have an incentive to negotiate over the use of copyrighted material. Sirius's result ensures Flo and Eddie can never receive compensation of any sort for public performance of its sound recordings.

8

of liability, the law involved as a California statute requiring pre-approval for marketing cosmetic products. *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1353 (Fed. Cir. 2013). The cases holding that a law may violate the Dormant Commerce Clause because of its "practical effects" on interstate commerce each involved state liquor-pricing schemes. *See Healy v. Beer Inst.*, 491 U.S. 332 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986). All of those state laws – pharmaceutical approval and liquor pricing laws – are classic instances of states exercising their regulatory power, and are very different from this case, where the issue is protection of property rights.

Protecting Flo and Eddie from the theft of its property is not "regulation"; a simple example illustrates the point. Suppose, instead of stealing Flo and Eddie's property rights in the sound recordings, someone stole its company car, which was then used to operate an interstate taxi service. The Dormant Commerce Clause obviously would not bar Flo and Eddie from maintaining an action at common law for conversion of the car. And that would be true even though the action, and the return of the car and the end of the taxi service, would affect interstate commerce. State laws barring theft do not violate the Dormant Commerce Clause.

Sirius also argues that the Court failed to address the balancing test *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). But that test, like the *per se* tests used in other cases, applies only to regulations. Thus, there was no need to discuss it in the Order separate and apart from the *per se* tests. All fail, and for the same reason.

Finally, Sirius that the Communications Act, 47 U.S.C. §§ 307 *et seq*. preempts any state from recognizing a public performance right in sound recordings because recognizing such a right would interfere with the ability of the FCC to regulate radio broadcasting. This is an entirely new argument, which could have been raised in support of the original motion but was not. It is not

9

-49-

properly raised on a motion for reconsideration; it is also inappropriately mentioned only in a footnote.

But this argument is yet another example of how Sirius' new counsel are deliberately missing the point. Nothing in this Court's Order "restricts content" of radio broadcasts. Congress expressly provided that common law copyright would subsist in pre-1972 sound recordings. *See* 17 U.S.C. § 301(c). The federal government thus recognizes the existence of common law copyright in older sound recordings. Flo and Eddie holds the common law copyright in the Turtles' pre-1972 sound recordings. Common law copyright, as Judge Hand reminds us in the very portion of his *Whiteman* decision on which Sirius relies, confers a legally recognized monopoly on the holder. That legally recognized monopoly gives Flo and Eddie – not the State of New York – the right to decide who, if anyone, is allowed to broadcast, or make any copies that are necessary to do so.

Sirius does nothing but raise red herrings. This case is not about the content of radio broadcasts; it is about whether Sirius has to pay for the privilege of copying and broadcasting pre-1972 sound recordings – just as it pays royalties through ASCAP and BMI to the composers of the music contained on all the recordings it broadcasts, and just as it pays statutory copyright holders for the privilege of playing post-1972 sound recordings. The Dormant Commerce Clause does not stand in the way of a purely private party's availing himself of his legal rights in order to protect his property. This Court harbors no doubt whatsoever that Flo and Eddie will be perfectly delighted to let Sirius play – for pay.

## III. Sirius's Motion to Certify an Interlocutory Appeal is Deferred

A district judge may certify an order for interlocutory appeal if (1) "such order involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion", and (3) "an immediate appeal from the order may materially advance the ultimate termination of

10

the litigation." 28 U.S.C. § 1292(a); *see Childers v. N.Y. & Presbyterian Hosp.*, No. 13 CIV. 5414, --- F. Supp. 2d ----, 2014 WL 2815676, at *21 (S.D.N.Y. June 23, 2014).

"A controlling question of law exists if: (1) reversal of the district court's opinion could result in dismissal of the action, (2) reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or (3) the certified issue has precedential value for a large number of cases." *In re Lloyd's Am. Trust Fund Litig.*, No. 96 CIV. 1262, 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997); *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990).

In considering a request for certification, the district court must carefully assess whether each of the three conditions for certifications is met. *See German v. Fed. Home Loan Mortg. Corp.*, 896 F.Supp. 1385, 1398 (S.D.N.Y.1995); *see also Gottesman v. General Motors Corp.*, 268 F.2d 194, 196 (2d Cir.1959) (certification is to be "strictly limited to the precise conditions stated in the law"). The determination of whether § 1292(b) certification is appropriate under the above standards is in the discretion of the trial court. *See Ferraro v. Sec. of U.S. Dept. of Health and Human Servs.*, 780 F.Supp. 978, 979 (E.D.N.Y.1992);

Sirius raises excellent arguments in favor of certification. However, I am going to defer ruling on this motion until I first address the outstanding order to show cause why summary judgment of liability should not be entered in favor of Flo and Eddie. The case for interlocutory certification is much stronger if the issue of liability is settled.

11

-51-

## CONCLUSION

For the foregoing reasons, Sirius's motion for reconsideration is **DENIED** and decision

on the motion for Section 1292(b) certification is **DEFERRED**.

Dated: December 12, 2014

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

FLO & EDDIE, INC., *individually and on behalf of all others similarly situated*,

        Plaintiff,

   -against-

SIRIUS XM RADIO INC., and DOES 1 through 10,

        Defendants.

---------------------------------------------------------------x

No. 13 Civ. 5784 (CM)

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 2/10/15

## DECISION AND ORDER CERTIFYING INTERLOCUTORY APPEAL

McMahon, J.:

    Plaintiff Flo & Eddie, Inc. ("Flo and Eddie") brings this action under New York law for common law copyright infringement and unfair competition against Sirius XM Radio Inc. ("Sirius"). On November 14, 2014, the Court denied Sirius's motion for summary judgment dismissing the case and ruled that plaintiffs – the owners of the common law copyrights in certain sound recordings made prior to February 1972 – had the right to exclusively publicly perform and reproduce those recordings. (Docket #88). On December 12, 2014, the Court denied Sirius's motion for reconsideration (Docket #108).

    In the alternative, Sirius asked this Court to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). That motion is **GRANTED**. Dockets #88 and Docket #108 are certified for interlocutory appeal because they present the following legal question:

1

Under New York law, do the holders of common law copyrights in pre-1972 sound recordings have, as part of the bundle of rights attendant to their copyright, the right to exclusive public performance of those sound recordings?[1]

## DISCUSSION

### I.  Standard for Certifying an Order for Interlocutory Appeal

A district judge may certify an order for interlocutory appeal if (1) "such order involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Childers v. N.Y. & Presbyterian Hosp.,* No. 13 CIV. 5414, --- F. Supp. 2d ----, 2014 WL 2815676, at *21 (S.D.N.Y. June 23, 2014).

"A controlling question of law exists if: (1) reversal of the district court's opinion could result in dismissal of the action, (2) reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or (3) the certified issue has precedential value for a large number of cases." *In re Lloyd's Am. Trust Fund Litig.*, No. 96 CIV. 1262, 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997); *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990).

In considering a request for certification, the district court must carefully assess whether all three § 1292(b) requirements are satisfied. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 529 (S.D.N.Y. 2014); *see also Gottesman v. General Motors Corp.*, 268 F.2d 194, 196 (2d Cir. 1959) (certification is to be "strictly limited to the precise conditions stated in the law"). The trial court is vested with discretion whether to certify an interlocutory appeal based

---

[1] As per my letter endorsement of January 28, 2015, I decline to certify a subsequent decision addressing whether Flo and Eddie were entitled to an immediate entry of judgment on the issue of liability. (*See* Docket #114).

2

on the above criteria. *See Ferraro v. Sec. of U.S. Dept. of Health and Human Servs.*, 780 F. Supp. 978, 979 (E.D.N.Y. 1992).

## II.    The Requirements for Certifying an Interlocutory Appeal are Met

Here, the requirements for certification are all met as to the question identified on the first and second page of this decision.

First, there is indeed a critically important controlling question of law in this case: whether the holders of common law copyrights in pre-1972 sound recordings have, as part of the bundle of rights appurtenant to their copyright, the right to exclusive public performance. If the Court's holding that they do have such a right is incorrect, then significant portions of this lawsuit – including the public performance copyright infringement and unfair competition claims – will have to be dismissed. Furthermore, reversal of this Court's ruling might well require reconsideration of the Court's fair use analysis in the context of Plaintiff's claim for copyright infringement on the basis of unauthorized copying – a right plaintiffs plainly enjoy, *see Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563-64 (2005) – since it is at least arguable that the making of temporary copies in order to facilitate the public performance of such sound recordings qualifies as "fair use." That would dispose of the entire case.

This issue also qualifies as a "controlling question of law" because it will have "precedential value for a large number of cases." *Lloyd's Am. Trust Fund Litig.*, 1997 WL 458739, at \*4. I previously noted that, "Other broadcasters, including those who publicly perform media and other sound recordings, will undoubtedly be sued in follow-on actions." Summary Judgment Decision at 40. Receiving authoritative guidance from the Second Circuit (and, I rather imagine, from the New York Court of Appeals) will help resolve those actions quickly and consistently.

3

The second criterion for certifying an interlocutory appeal is also satisfied because "there is substantial ground for difference of opinion" concerning the Summary Judgment Decision. 28 U.S.C. § 1292(b).

Flo and Eddie correctly observes that substantial ground does not exist for differences of opinion merely because an issue is one of first impression about which little case law exists. But here there is far more than a previously unaddressed question of law. There is in fact a difficult legal question about which reasonable minds can differ. *See Klinghoffer*, 921 F.2d at 25.

The Court held that under New York law the right to publicly perform sound recordings is part of the bundle of rights associated with common law copyrights in those recordings. That conclusion was reached primarily upon consideration of New York's treatment of common law copyrights in other types of works. But while this Court believes it reached the correct result, I appreciate that another judge might feel differently. In this regard, I note particularly that federal statutory copyrights in sound recordings did not come with an associated right to exclusive public performance until Congress passed a law in 1995, which provided a limited "exclusive right[] . . . to perform [copyrighted sound recordings] publicly by means of a digital audio transmission." 17 U.S.C. § 106; *see* Digital Performance Right in Sound Recordings Act of 1995, Pub. L. 104-39, 109 Stat. 336. Between 1971, when Congress first granted statutory copyright protection to sound recordings, and 1995, Congress did not include public performance rights among the specifically enumerated rights granted to holders of copyrights in sound recordings. Of course, the very fact that Congress felt compelled to carve out a statutory exception for public performance rights, by excluding them from the bundle of rights associated with copyrights in sound recordings, suggests that such rights would otherwise have existed, and so exist at common law. *See* Summary Judgment Decision at 20-21 & n.3. However, the complicated history of public performance rights

4

and copyright in the discrete medium of sound recordings makes the answer to this question less than straightforward, and warrants a close look by a controlling court.

Turning to the third factor, "an immediate appeal from [the Summary Judgment Decision] may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). If I am wrong about public performance rights for holders of copyrights in pre-1972 sound recordings then this lawsuit will end, either immediately or in short order, after this Court revisits whether Sirius's limited copying of pre-1972 recordings qualifies as fair use.

If, however, this Court's ruling is affirmed, then Sirius and the holders of copyrights in pre-1972 sound recordings will turn their attention to the thorny but ultimately soluble issue of how to license and compensate public performances of those recordings. That negotiation, which would also advance the termination of this litigation, will never proceed until there is a definitive ruling on this question of first impression.

Following other district courts in this Circuit, I have identified a particular controlling question of law which I am certifying to the Second Circuit. *See, e.g., Transp. Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 352 (S.D.N.Y. 2005); *Maestri v. Westlake Excavating Co.*, 894 F. Supp. 573, 577 (N.D.N.Y. 1995); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 664 F. Supp. 91, 95 (S.D.N.Y. 1987) *rev'd on other grounds*, 859 F.2d 242 (2d Cir. 1988); *see also J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 115 (2d Cir. 2004) ("The district court certified only the subject matter jurisdiction issue for interlocutory appeal and denied the School District's motion insofar as it sought certification of the district court's ruling on the sufficiency of plaintiffs' Section 504 and Section 1983 claims."). I recognize, however, that "Though it is helpful for a district court to frame the controlling questions of law that the order involves, . . . the statutory procedure specifies appeal of the order, rather than certification of the

5

questions . . . ." *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1157 (2d Cir. 1986); *see also Isra Fruit Ltd. v. Agrexco Agr. Exp. Co.*, 804 F.2d 24, 25 (2d Cir. 1986) ("[S]ection 1292(b) authorizes certification of orders . . . not certification of questions. Of course, in certifying an order for interlocutory review it is helpful if the district judge frames the controlling question(s) that the judge believes is presented by the order being certified.") (internal citations omitted). As a result, although I am certifying only a "portion" of an order for interlocutory appeal, I recognize that the Second Circuit's Circuit's review is "not necessarily limited to the certified issue;" the Court of Appeals has "the discretion to consider any aspect of the order from which the appeal is taken." *J.S.*, 386 F.3d at 115. This includes a second question of law that Sirius asked this Court to certify: assuming this Court answered the certified question correctly, does the Dormant Commerce Clause prohibit the State of New York from enforcing a property right that it recognizes at common law? That question, too, qualifies as "controlling," and its resolution could materially advance the resolution of this lawsuit. However, I do not believe that there is substantial ground for a difference of opinion on that issue, so I would not certify the case if that were the only question raised, and I do not base my decision to certify an interlocutory appeal on the presence of this question in the case.

## III.    Further Proceedings in The Action Are Stayed Pending Interlocutory Appeal

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441-42 (2d Cir. 1964) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)). "A district court's authority to stay a pending action is an aspect of its broad and inherent power over its own process, to prevent abuses, oppressions and injustice, so as not to produce hardship, and to do substantial justice. In issuing a stay, a court must weigh competing interests and maintain an even

6

-58-

balance." *Soler v. G & U, Inc.*, 86 F.R.D. 524, 526 (S.D.N.Y. 1980) (internal citations, quotation marks, and alterations omitted).

Here, the competing interests favor granting a stay.

As explained above, judicial economy strongly favors staying the proceedings pending resolution of the legal question at the core of this action. Whether or not the Court's judgment on appeal is affirmed, granting a stay now, rather than proceeding with cumbersome class-wide discovery, a motion for certification, and ultimately a decision on damages, is very likely to save time and money for the litigants – whether by resolving the case outright or by providing a basis on which the parties can negotiate licenses for the public performance of pre-1972 sound recordings.

It is true that Sirius would not suffer irreparable harm if a stay is denied. Its injury – if it is in fact injured by the failure to grant a stay – would be in the form of monetary costs. However, granting a stay would not impose substantial hardship on Flo and Eddie. Flo and Eddie has tolerated public performances of sound recordings in which it holds common law copyrights, by both digital and terrestrial broadcasters, for decades. If Flo and Eddie prevails on appeal, it can obtain damages for all Sirius's acts of infringement dating from three years before its complaint was filed. It loses not a dime's worth of potential damages by holding up until the legal issue is resolved.

With the balance of hardships thus favoring neither side, the public interest in judicial economy rules the day. The Court will stay this action.

7

## CONCLUSION

For the foregoing reasons, Sirius's motion to certify the Summary Judgment Decision and the Decision on Reconsideration for interlocutory appeal is **GRANTED**, and this action is **STAYED** pending a decision by the Second Circuit.

Dated: February 10, 2015

_Colleen McMahon_

U.S.D.J.

BY ECF TO ALL COUNSEL

## **PROOF OF PERSONAL SERVICE**

I am a citizen of the United States and employed in the County of Los Angeles, State of California, by First Legal Support Services, whose address is 1511 W. Beverly Blvd., Los Angeles, CA 90026-5704, and which has been employed by a member of the bar of this Court at whose direction the service was made. I am over the age of eighteen years and not a party to the within action. On February 20, 2015, I personally served the following:

### **PETITION FOR PERMISSION TO APPEAL**
### **PURSUANT TO 28 U.S.C. § 1292(b) AND FED. R. APP. PROC. R. 5**

by delivering a copy thereof to the office of the following:

Henry D. Gradstein, Esq.
Maryann R. Marzano, Esq.
Harvey W. Geller, Esq.
Gradstein & Marzano
6310 San Vicente Blvd., Ste. 510
Los Angeles, CA 90048
Phone: (323) 776-3100
Fax:    (323) 931-4990
        *Attorneys for Flo & Eddie,*
*Inc.*

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on February 20, 2015 at Los Angeles, California.

SIGNATURE: _____

PRINTED NAME: JEFF INZAR